By the Court—Bosworth, Ch. J.
It is important to determine preliminarily whether the order appealed from was properly denied, for the reason that a motion for a new trial, on the ground of surprise or of newly discovered evidence, cannot be made after judgment perfected.
The trial of the action was concluded on the 17th of November, 1858, and judgment was entered on the 9th of December, 1858, its entry until that time having been delayed at the request of the plaintiff’s attorneys. A notice that the plaintiff appealed from that judgment, was served on the 23d of December. On the 11th of January, 1859, notice of a motion for a new trial, “ on the ground of surprise and newly discovered evidence,” was *78 served.; the notice stating that the motion would he made on the 19th of that month. From the order denying that motion, the plaintiff has appealed to the General Term.
Prior to the Code, it was settled that a motion for a new trial on the ground of newly discovered evidence or surprise, could not be made after judgment perfected. (Roosevelt v. The Heirs of Fulton, 7 Cow., 107; Jackson v. Chace, 15 J. R., 354; Rapelye v. Prince, 4 Hill, 125.) Neither could it have been made on a case after judgment perfected. It became necessary for a party wishing to make such a motion, to obtain a stay of proceedings so that judgment could not be entered until the motion was made.
A bill of exceptions, per se, stayed proceedings and prevented the entry of judgment. It was only necessary to obtain a stay of proceedings by order until the settlement of- the bill. This was the rule in force when the Code took effect, except that the act of 1832 (chap. 128, p. 188,) allowed judgment to be perfected, although a bill of exceptions had been settled, (unless a stay of proceedings was granted,) and the bill of exceptions to be argued, notwithstanding judgment had been perfected. (Graham’s Pr., 329.)
This practice, in force when the Code took effect, is as much the practice now as previously, when not inconsistent with the Code itself or the rules adopted under it. (Code, §§ 46.9, 470.)
The Code provides, in cases tried by jury, for “ a motion for a new trial, on a casé or exceptions, or otherwise,” (§ 265,) and for an appeal from the order granting or refusing it, (§ 349,) and for an appeal from a judgment, as a substitute for a writ of error. (§§ 323, 348.)
Section 265 contains no provision allowing a motion for a new trial to be made under circumstances which, by preexisting practice, would preclude a party from making such a motion. Now, as before the Code, a party wishing to make a motion for a new trial, on the ground of newly discovered evidence or surprise, must obtain a stay of proceedings to secure that right.
In Mersereau v. Pearsall, (6 How. Pr. R., 293,) the preexisting rule was admitted to be such as I have stated, but the opinion was expressed that, under the Code, such a motion could be made after judgment perfected. That opinion seems to rest on the *79 considerations due to the supposed fact that prior to the Code judgment could only be entered in term time, and a defendant had four days in term, after rule for judgment had been entered, to make his motion, whereas judgment can now be entered in vacation; and to the idea that if not now permitted to move “ after judgment, the defendant would practically be denied the benefit of such motions in all cases.” (Id., 294.)
With reference to the assumption that judgment could only be entered in term, it may be observed, first, that in the case of trials in circuits held in term time, the prevailing party could file his circuit roll and postea at once, enter a rule for judgment, and four days thereafter perfect his judgment. -The terms of the Supreme Court, for all purposes of entering rules' for and perfecting judgments, continued four .weeks. (2 R. S., 197, §6.) The same difficulty attended the making of motions for new trials in such cases, as in actions tried under the Code.
But as early as June, 1840, judgments could be “ entered and perfected at any time in term or in vacation.” (Chap. 386 of Laws of 1840, p. 327, §§ 23 and 41.) The case of Rapelye v. Prince, (4 Hill, 125,) was tried in 1842, and the rule previously enforced was in no way modified or relaxed, because when that action was tried, judgments could be entered in vacation. The judgment in that case was perfected in vacation.
If a party is surprised by anything to his prejudice occurring at the trial, or if on the whole case he thinks injustice has been done to him, he knows it, at least, as soon as the verdict is rendered, and should apply for a stay of proceedings.
I think there is no just ground of complaining that such orders are not granted with sufficient facility to enable a defeated parly to obtain a further hearing.
In the present case there is, properly speaking, no surprise. The defendant at the trial found himself without any evidence to prove that “James Travers had no title to the seventeen lots when the agreement to exchange was made,” except such as by the plaintiff’s permission he was permitted to give. That evidence was in writing. Before consent to its being read was given, the plaintiff knew what it was, and for what purpose its introduction was sought.
*80 The plaintiff was nonsuited solely or partly in consequence of the evidence being given, which he consented might be so read. Under such circumstances there is no ground for expressing surprise at anything except the decision of the Court. That was excepted to, and, if erroneous, will entitle the defendant to a new trial, not on the ground of surprise, but because it was error to grant the nonsuit.
If the defendant could make such a motion, even after judgment perfected, when his delay to move earlier was excused, no reason is shown why James Travers was not immediately applied to for information as to the time he delivered the deed to his daughter,- and notice of the motion sooner served.
This Case furnishes no reasons for departing from the previously well settled practice, which we regard as being now in full force, that a motion for a new trial, on the ground of surprise or newly discovered evidence, must be made before, and cannot be made after, judgment perfected.
When, as a condition to staying proceedings, security is required to be given, and judgment is permitted to be entered, not absolutely, but as security merely, it is reasonable to hold that such an entry of judgment is not a bar to such a motion. (Benedict v. Caffe, 3 Duer, 669; Superior Court Rules adopted Jan. 18, 1851, Rule 8, p. 660 of 5th ed. of the Code.) In such a case the judgment is not absolute when it is entered nor so long as it stands as security only.
A motion for a new trial is not different in any of its material incidents from the like motion under the practice as it existed when the Code took effect. (Morgan v. Bruce, 1 Code R., H. S., 369.) The considerations or facts which, prior to the Code, would be a bar to such a motion, are so now, unless there be special cases which, by the Code itself, cannot now have that effect. If there be any such cases, newly discovered evidence, or surprise, as the ground of a new trial, is not among the number.
In a case tried by a jury, an appeal from the judgment under section 348, brings under consideration only questions of law. (Code, § 348.)
It follows, if these views are correct, that the order appealed from must be affirmed, and that in considering the appeal from *81 the judgment we can look only at the exceptions taken by the plaintiff during the progress of the trial. The affidavits on which the order was made, and the facts stated in them, should be as absolutely excluded from the mind, in considering and determining the appeal from the judgment, as if made in some other cause between other parties.
Was the plaintiff rightly nonsuited? is the only question raised by the appeal from the judgment.
The paper of the date of the “14th April, 1854,” did not authorize Barnes to execute, as agent of Roberts, the agreement of the 24th of May, 1854. At the most it authorized him to negotiate or effect such an exchange as that paper described.
There is no pretense that Roberts assented to the agreement of the 24th of May, 1854, as it was drawn.
Barnes testifies that Roberts, on being shown and furnished a copy of that agreement, said, “ that he had painted his house in Thirty-ninth street, and had put in the gas, and that if Mr. Travers would pay for these, it would be all right.”
There was never any agreement signed by Travers or Roberts, expressing this modification, even if it be true that Travers assented to it. It was not, therefore, in the power of Roberts to compel Travers to perform, specifically, the agreement as Barnes says it was assented to even if the title to the seventeen lots had been in Travers, because Travers never signed any such written agreement.
He never tendered a deed of the seventeen lots executed by himself or any one else, to Roberts. The seventeen lots were encumbered by judgments against James Travers. There is no evidence that Roberts knew this, when the agreement of the 24th of May, 1854, was shown to him, and these Travers neither discharged nor offered to discharge. He never offered to pay for painting the house in Thirty-ninth street, or for putting in the gas.
On the evidence contained in the case, he was unable to perform the contract, at any time after the negotiations with him were commenced. There is no pretense that these were commenced earlier than in March, 1854.
James Travers bought these lots for his daughter, of P. W. Engs, and took a deed of them, dated the 1st of February, 1854, executed his bonds and mortgaged the lots, to secure the purchase *82 money in whole or in part, and by a deed of the same date, conveyed them to his daughter.
Barnes admits that he knew, on the 24th of May, 1854, that Travers had bought these lots for his daughter, but says he did not then know whether she owned them or not. He says he did not know that Travers had a lot of judgments against him.
The defendant testified, that near the 1st of May, 1854, he went to Barnes’ office several times “to see if arrangements were to be carried out.” Barnes told him, “ he supposed Travers had backed down.” After that the defendant rented his house, and conditionally sold one. After this and about the 22d or 23d of May, 1854, Travers called on him to see whether he “ would not do a little better with the trade.” Roberts told Travers he “supposed the trade had been all given up, and that he had promised one lot to another party, and that if I (Roberts) did anything, he must take another house and pay for my expenses, and that the terms I had given to Mr. Barnes were the best terms I would trade upon.”
Travers does not deny that these conversations were had. After this the contract of the 24th. of May, 1854, was signed. Roberts says he immediately went to Barnes’ office and told Camp, a person there, and Barnes, that he would not act on the contract. That Travers called on him again in a few days, when he told Travers the same thing, and on Travers denying his statements he showed him the door, and heard no more of the matter until the 29th of June, 1854, when he received the note of Joshua Barnes, which was produced on the trial, to which he paid no attention. That note reads thus:
“ Dear Sir—I am requested to state that Mr. James Travers will be ready on 1st July, ’54, to complete contract.
“Your ob’t,
Joshua Barnes,
“Agent for James Travers.
“ To Mr. Edward Roberts.”
Travers does not deny any of these matters, which Roberts testifies occurred between them.
The evidence furnishes some grounds for inferring that Barnes and Travers were not deceived or misled, but were conscious, ' *83 when they signed the paper of the 24th of May, 1854, that Roberts supposed the whole negotiation was at an end, and knew he would not assent to a contract on those terms, but had some idea that the writing of the 14th of April, 1854, put it in the power of Barnes to bind Roberts by the contract.
Roberts’ signature to it might as well have been had as Barnes’, if he was willing to enter into such a contract; and Mr. Chamberlin suggested to them, when preparing, or about to execute it, “ that Roberts had better be there."
The evidence does not justify the conclusion that Barnes had accomplished any result for which it was agreed he should be paid, or which entitled him to commissions.
He never obtained from Travers any written contract to which Roberts assented. He did not, therefore, either effect a sale or exchange of any lots, nor any agreement for a sale or exchange, which his principal accepted.
He never made any contract, verbal or written, or partly verbal and partly written, which Travers is shown to have been able to carry into effect. On the contrary, the evidence shows that he was not able to perform, on his part, the contract which Barnes says he assented to; and he never contracted in such form that he could have been compelled to perform it, even had the title been in him, and the lots been free from the incumbrance of the judgments.
A broker, like any other person who seeks to recover a fixed sum on the ground that he was employed to do a particular thing for a stipulated compensation, must allege, (and prove, if his allegations be denied,) what it was that he was employed to do, and that he has done it, as the terms of the agreement between him and his employer required.
The complaint alleges that he was' employed to negotiate a purchase for and sale to the defendants of seventeen lots of ground.
If it is clear, upon the evidence, what precisely he was to do, to earn his commission, then I think it must be admitted that he was to negotiate the exchange which Roberts, by his offer of the 14th of April, 1854, written on the back of one of Barnes’ cards, consented to make.
*84 It is one thing to agree with a broker to pay him a stipulated sum to obtain from a third person a valid contract to make a prescribed exchange, and another thing to agree to pay a fixed sum to effect or negotiate an exchange which will vest in the employer a good title to designated lots, subject only to specified incumbrances.
In the latter case, the commissions are not earned until the broker finds a person able and ready to make the exchange and convey to his employer the title, which alone, by the terms of his offer and of the broker’s employment, the principal of the latter agreed to take and has a right to demand.
Barnes gave no evidence on his behalf justifying the conclusion, nor does all the evidence given justify the conclusion, that he negotiated an exchange with any person who was able to convey such a title to the seventeen lots as Roberts ever agreed to take.
Nor does it warrant the conclusion that he ever obtained a contract obligatory upon Travers to which Roberts ever assented, much less one which Roberts agreed with Barnes to accept as performance by the latter of the services which he was to render as a condition to his right to be paid commissions.
There was, therefore, no question of fact to be submitted to the jury.
The plaintiff was permitted to amend his complaint, (as I understand the object of the amendment,) to enable him to prove that he was employed to negotiate an exchange of enumerated lots, and that he had done all he was employed and undertook to do, and therefore had earned the stipulated compensation.
As the evidence was not sufficient to warrant a verdict finding that he had negotiated an exchange upon the terms that he was authorized to negotiate it, or that he had succeeded in inducing any person, having a title to the seventeen lots which, if the exchange was effected, were to be conveyed to the defendant, subject to specified incumbrances only, to make a conveyance which would vest such a title in the defendant; or that he had made a valid contract with any person to exchange on the proposed terms who was able and ready to perform such contract on his part; or that he had made any agreement with any person *85 which Roberts accepted as performance by the broker of the stipulated services which he was to render, the plaintiff was properly nonsuited.
Whatever may be the ground on which the nonsuit was asked, yet, inasmuch as it does not appear that the judge assumed to nonsuit on any one specified ground only, I think it a just view to take that he granted the motion because he was clear that, on the whole case, the plaintiff was not entitled to recover.
If the views above expressed are correct, it would be our duty, if he had refused to nonsuit and his decision had been excepted to, and he had submitted the cause to the jury and a verdict had passed for the plaintiff, to grant a new trial.
I think the judgment should be affirmed.
Hoffman, J., dissented from the conclusion above expressed in relation to the appeal from the judgment. Monceief, J., concurred with the Chief Justice.
The order and judgment appealed from were affirmed.