JOHN G. SIBBALD, Respondent, *v.* THE BETHLEHEM IRON Co., Appellant.

The duty of a broker, employed to sell property, is to bring the buyer and seller to an agreement. While it is not essential that he should be present and an active participator in the agreement or sale when it is actually concluded, to entitle him to his commissions he must produce a purchaser ready and willing to enter into a contract on the employer's terms. He is not entitled to commissions for unsuccessful efforts to effect a sale, unless the failure is caused by the fault of the principal.

Where no time for the continuance of the contract between the broker and his principal is fixed, either party is at liberty to terminate it at will, subject only to the ordinary requirements of good faith.

Where the broker has been allowed a reasonable time to procure a purchaser and effect a sale, and has failed so to do, and the principal in good faith has terminated the agency, and sought other assistance by means of which a sale is consummated, the fact that the purchaser is one whom the broker introduced, and that the sale was in some degree aided by his previous unsuccessful efforts, does not give him a right to commissions.

Defendant employed plaintiff, a broker, to sell the steel rails of its manufacture to the G. T. R. R. Co. After various unsuccessful negotiations for a sale, carried on during a period of four months, between that company and plaintiff, during which defendant had fixed its prices several times, upon receipt of a telegram from said company, asking upon what terms one thousand tons of defendant's rails would be delivered, plaintiff telegraphed to defendant asking its lowest terms. Defendant declined to fix a price or to negotiate farther through plaintiff; and the latter thereupon telegraphed to the G. T. R. R. Co. that defendant declined to name a price. Subsequently a sale was made by defendant to said company through another broker. Upon the trial of an action to recover commissions, the court was requested to charge that defendant had the right, under the circumstances, to refuse to use the services of plaintiff if the action was taken in good faith and without intent to deprive him of his commissions. The court so charged, with the qualification, however, that defendant had no right, acting either in good or bad faith, to avail itself of what plaintiff had done, to make a sale through other agencies. *Held*, that the qualification was error; that defendant had the right to terminate the agency as it did; and, if done in good faith, plaintiff had no right to compensation although his efforts were of benefit in the subsequent successful negotiation.

(Argued December 9, 1880 ; decided January 18, 1881.)

APPEAL from a judgment of the General Term of the Supreme Court, in the first judicial department, entered upon an

order made November 6, 1879, affirming a judgment in favor of plaintiff entered upon a verdict and affirming an order denying a motion for a new trial.

This action was brought by plaintiff, as broker, to recover commissions alleged to have been earned in effecting certain sales of steel rails, manufactured by the defendant, to the Grand Trunk Railroad Company.

The facts appear sufficiently in the opinion.

*Albert Stickney* for appellant. Plaintiff's efforts as broker having been lawfully terminated, the court erred in not directing a verdict for defendant. (*Wylie* v. *Marine Nat. Bk.*, 61 N. Y. 415, 419; *McClave* v. *Paine*, 49 id. 561; *Satterthwaite* v. *Vreeland*, 3 Hun, 152, 155; *Sibree* v. *Tripp*, 1 L. R. [C. P. Div.] 505.)

*Thomas Hy. Edsall* for respondent.

FINCH, J. The evidence satisfactorily shows that the defendant employed the plaintiff to sell the steel rails of the former's manufacture to the Grand Trunk Railroad Company. The existence of such a contract was strenuously denied on the part of the appellant, but the proofs establish it and leave it without substantial contradiction. The plaintiff swears that in December, 1873, he met and was introduced to Mr. Hunt, the president of the defendant corporation, and was requested by him to use the plaintiff's exertions and interest in selling steel rails of the Bethlehem Iron Company's make, and particularly to the Grand Trunk Railway of Canada, and that the plaintiff agreed to do so if he could. Hunt was afterward examined and does not contradict this statement. Indeed he almost admits it. He says," I presume I was introduced to Mr. Sibbald in December 1873. I have no recollection of it. After my introduction to him I may have called upon him in his office in New York. He says I did, and I accept his statement up to his sale of 14th of April." Mr. Evans, in whose presence the conversation detailed by plaintiff took place, was also examined as a witness by

the defendant. He admits the meeting on that occasion; that he introduced Sibbald to Hunt as a man engaged in selling steel rails; that several railways were named as purchasers from plaintiff, " the Grand Trunk doubtless among them;" and then he adds, "I do not remember that any thing definite was said as to his selling any rails for the Bethlehem Co., but there may have been."

Upon this state of facts it is very evident that there was a general employment of the plaintiff by the defendant to sell its rails so far as he was able, and especially to the Grand Trunk Railway, with whose purchasing officers he was supposed to be in communication and to have influence. It follows that the first alleged error committed upon the trial, that the court refused a request to direct a verdict for the defendant on the ground that the plaintiff had not proved as to the transaction in suit any employment by the defendant, cannot be so regarded. The general employment was sufficiently definite and broad to have related and applied to the sale finally made, if indeed that resulted from plaintiff's influence and exertion. Nor do we see any fault in the charge of the court in this connection, that it was immaterial whether the broker was originally employed, or whether, after he had brought the thing about, the principal availed himself knowingly of the fruits of the action of the broker. This is only saying that the contract of employment may be established either by proof of an express and original agreement that the services should be rendered, or by facts showing, in the absence of such express agreement, a conscious appropriation of the labors of the broker. Indeed, the learned counsel for the defendant very fairly and justly concedes that the contract may be established in some cases " by the mere acceptance of the labors of a broker."

It follows also that there was no error in the further charge of the court, that the only remaining question was whether plaintiff was the procuring cause of the sale. Having been employed to make it, the only remaining inquiry was of necessity whether he did make it either directly, or as its efficient and producing cause. That inquiry brings up for our consideration what

the plaintiff in fact did, and what inferences are to be justly. drawn from the attendant circumstances. The question, simple up to this point, grows rapidly difficult and complicated, partly by reason of the inherent uncertainty and ambiguity of the subject itself, and partly, perhaps, because of a wide range of judicial discussion not always entirely harmonious. The learned judge who tried the case at the Circuit, in his charge to the jury, realized and explained the difficulty of applying the appropriate legal rules to the particular facts of transactions like that under discussion.

It may aid, therefore, to clearness of statement and accuracy of conclusion, and perhaps remove some elements of debate, if we consider the legal attitude of a broker employed to buy or sell property, and his relative rights and duties as the basis of his claim for compensation.

The duty he undertakes, the obligation he assumes as a condition of his right to demand commissions, is to bring the buyer and seller to an agreement. In that all the authorities substantially concur, although expressing the idea with many differences of phrase and illustration. The description and definition of a broker involves this view of his duty. Story says, " The true definition of a broker seems to be that he is an agent employed to make bargains and contracts between other persons in matters of trade, commerce or navigation for a compensation commonly called brokerage." (Story on Agency, § 28, p. 25.) In *Pott* v. *Turner* (6 Bing. 702, 706) a broker is more tersely, and quite accurately, described as " one who makes a bargain for another and receives a commission for so doing." In *Barnard* v. *Monnot* it was said that the duty of the broker consisted in bringing the minds of the vendor and vendee to an agreement. (16 How. Pr. 440.) In *Wylie* v. *Marine National Bank* (61 N. Y. 416) it was held that to entitle the broker to commissions, he must produce a purchaser ready and willing to enter into a contract on the employer's terms. This implies and involves the agreement of buyer and seller, the meeting of their minds, produced by the agency of the broker. In *Moses* v. *Burling* (31 N. Y. 462) it

was declared that the authorities clearly establish the proposition that until the broker has faithfully discharged the obligation assumed in the contract with his principal, he is not entitled to his agreed commission, and that obligation is fulfilled only when he produces a party ready to make the purchase at a satisfactory price. In *Glentworth* v. *Luther* (21 Barb. 147) it was declared that commissions were earned when the broker produces to his principal a party with whom the owner is satisfied, and who contracts for the purchase at an acceptable price. It was not meant by these cases, and we do not mean, that the broker must of necessity be present and an active participator in the agreement of buyer and seller when that agreement is actually concluded. He may just as effectually produce and create the agreement, though absent when it is completed and taking no part in the arrangement of its final details. And it is to describe such instances that courts have used a different form of expression, entirely accurate in its proper application, but capable of being warped from its obvious meaning. In *Loyd* v. *Watkins* (51 N. Y. 132) the phrase used was that the broker was entitled to reward when the sale was effected through his agency as the procuring cause. And in *Lyon* v. *Mitchell* (36 N. Y. 237) the broader language is used that his efforts must have led to the negotiations that resulted in the purchase of the vessel. But in all the cases, under all and varying forms of expression, the fundamental and correct doctrine is, that the duty assumed by the broker is to bring the minds of the buyer and seller to an agreement for a sale, and the price and terms on which it is to be made, and until that is done his right to commissions does not accrue. (*McGavock* v. *Woodlief,* 20 How. [U. S.] 221; *Barnes* v. *Roberts,* 5 Bosw. 73; *Holly* v. *Gosling,* 3 E. D. Smith, 262; *Jacobs* v. *Kolff,* 2 Hilt. 133; *Kock* v. *Emmerling,* 22 How. [U. S.] 72; *Corning* v. *Calvert,* 2 Hilt. 56; *Trundey* v. *N. Y. & Hartf. Steamboat Co.,* 6 Robt. 312; *Van Lien* v. *Burns,* 1 Hilt. 134.)

We have been thus particular in the examination and statement of the rule, because of a possible tendency, growing out

of a variety of circumstances and modified forms of expression, to give it an extent and meaning not at all intended.

It follows, as a necessary deduction from the established rule, that a broker is never entitled to commissions for unsuccessful efforts. The risk of failure is wholly his. The reward comes only with his success. That is the plain contract and contemplation of the parties. The broker may devote his time and labor, and expend his money with ever so much of devotion to the interests of his employer, and yet if he fails, if without effecting an agreement or accomplishing a bargain, he abandons the effort, or his authority is fairly and in good faith terminated, he gains no right to commissions. He loses the labor and effort which was staked upon success. And in such event it matters not that after his failure, and the termination of his agency, what he has done proves of use and benefit to the principal. In a multitude of cases that must necessarily result. He may have introduced to each other parties who otherwise would have never met; he may have created impressions which, under later and more favorable circumstances, naturally lead to and materially assist in the consummation of a sale; he may have planted the very seeds from which others reap the harvest; but all that gives him no claim. It was part of his risk that failing himself, not successful in fulfilling his obligation, others might be left to some extent to avail themselves of the fruit of his labors. As was said in *Wylie* v. *Marine National Bank* (61 N. Y. 416, *supra*), in such a case the principal violates no right of the broker by selling to the first party who offers the price asked, and it matters not the sale is to the very party with whom the broker had been negotiating. He failed to find or produce a purchaser upon the terms prescribed in his employment, and the principal was under no obligation to wait longer that he might make further efforts. The failure, therefore, and its consequences were the risk of the broker only. This, however, must be taken with one important and necessary limitation. If the efforts of the broker are rendered a failure by the fault of the employer; if capriciously he changes his mind after the purchaser, ready and will-

ing, and consenting to the prescribed terms, is produced; or if the latter declines to complete the contract because of some defect of title in the ownership of the seller, some unremoved incumbrance, some defect which is the fault of the latter, then the broker does not lose his commissions. And that upon the familiar principle that no one can avail himself of the non-performance of a condition precedent, who has himself occasioned its non performance. But this limitation is not even an exception to the general rule affecting the broker's right, for it goes on the ground that the broker has done his duty, that he has brought buyer and seller. to an agreement, but that the contract is not consummated and fails through the after-fault of the seller. The cases are uniform in this respect. (*Moses v. Burling, Glentworth v. Luther, VanLien v. Burns, supra.*)

One other principle applicable to such a contract as existed in the present case needs to be kept in view. Where no time for the continuance of the contract is fixed by its terms, either party is at liberty to terminate it at will, subject only to the ordinary requirements of good faith. Usually the broker is entitled to a fair and reasonable opportunity to perform his obligation, subject of course to the right of the seller to sell independently. But that having been granted him, the right of the principal to terminate his authority is absolute and unrestricted, except only that he may not do it in bad faith, and as a mere device to escape the payment of the broker's commissions. Thus, if in the midst of negotiations instituted by the broker, and which were plainly and evidently approaching success, the seller should revoke the authority of the broker, with the view of concluding the bargain without his aid, and avoiding the payment of commissions about to be earned, it might well be said that the due performance of his obligation by the broker was purposely prevented by the principal. But if the latter acts in good faith; not seeking to escape the payment of commissions, but moved fairly by a view of his own interest; he has the absolute right before a bargain is made while negotiations remain unsuccessful, before commissions are earned, to revoke the broker's authority, and the latter cannot

thereafter claim compensation for a sale made by the principal, even though it be to a customer with whom the broker unsuccessfully negotiated, and even though, to some extent, the seller might justly be said to have availed himself of the fruits of the broker's labor.    Thus in *Satterthwaite* v. *Vreeland* (3 Hun, 152), it was held that the broker earned his commissions by making a sale on the terms fixed by the principal while the authority continued.    Judge DANIELS said, and we think correctly, that " to maintain a claim by the broker for his commissions, it was necessary that he should be able to show that he had either procured a purchaser for the property at the price for which he was empowered to sell, or that the defendant had deprived him of the opportunity to do so while the privilege lasted."    In that case, after the termination of the broker's authority, the principal sold to the person with whom the broker had negotiated at a less price ; and it was held that he had a right to do so, unless his action was a mere device to escape the payment of commissions.    Any other rule would prolong a contract with a broker indefinitely.    No man could know when he was freed from its obligations, and a liability would be imposed not contained in the terms of the contract, and essentially perverting its legitimate construction.

We may now apply these principles to the facts of the present case.    The plaintiff began his efforts to sell the steel rails of the Bethlehem Iron Company very soon after authority was given him.    In the latter part of December, 1873, he went to Canada, and proposed to Mr. Brydges, who was managing director of the Grand Trunk Railway, to sell him the steel rails of the defendant's manufacture.    Brydges declined the proposition, saying he was not then in the market, but when he was would let plaintiff know.    On the fifth of January, the defendant having reduced its price and fixed it at $108 per ton, plaintiff wrote to Brydges telling him of the reduction and that the defendant offered to sell at $108 currency.    At the close of his letter the broker adds, " I think a firm cash offer of $105 to $107 currency would be accepted by the Bethlehem Iron Company."    This suggestion is severely criti-

cised by the appellant's counsel and with some apparent reason. The broker was bound to maintain a steady fidelity to the interests of his principal. He had no right to sacrifice the interest of the latter for the benefit of the buyer, and yet it may well be that buyer and seller could only be brought to the consent of a bargain by some moderate concession as to price, and that the broker acted fairly, in view of his talk with Hunt about a reduction, in making the suggestion which is assailed as a violation of duty. On the ninth of January plaintiff again wrote Brydges that defendant was anxious for an order, and inclined to accept a reduction. On February fifth the broker again wrote substantially the same thing. Between the twentieth of that month and the eighth of March he was in Montreal having other business for other parties and accomplished nothing. On the seventh of April he received a telegram from Brydges asking the price of one thousand tons of steel rails, "either of English or American manufacture," for immediate delivery. This seemed a hopeful inquiry. Plaintiff, after getting a price from Evans, telegraphed an offer for the defendant at $106 currency. At the same time the plaintiff wrote Brydges, repeating the offer but also transmitting offers by other parties of English rails. What that meant, and what its effect on defendant's interests was, is made plain by the further fact that no order came for the defendant's rails, but Sibbald bought for the Grand Trunk, on the 11th of April, five hundred and twenty tons, and on the 14th of April eighty tons of English rails. Meanwhile, and on the 11th of April, he caused to be sent to the Grand Trunk Railway a broken piece of defendant's rail to show the quality of the steel. On the 21st of April he wrote to Hannaford, the chief engineer of the Grand Trunk, explaining the object of sending the fractured rail, and that the defendant would roll to that company's section, and, if required, punch or bore holes round in rails.

On or about the 23d of April, 1874, plaintiff received a telegram from the Grand Trunk Railway, asking upon what terms one thousand tons of steel rails of the Bethlehem Iron Com-

pany would be delivered at Portland. On the same day he telegraphed to the defendant to know the lowest price, and stating that the rails inquired about were for the Grand Trunk. Just such an incident had occurred once before, as we have seen, and nothing had come of it. At that time a price had been named but no purchase had resulted. Was it unreasonable if the patience and confidence of the principal became exhausted? Mr. Hunt telegraphed that he would see plaintiff the next day. He did so, and in that interview declined to name a price, or negotiate further through plaintiff. On that same day the latter telegraphed and wrote to the Grand Trunk officers that the Bethlehem Company declined to name a price. This ended the agency, terminated the contract; left each party at entire liberty, if the action of the defendant was within its legal rights and exercised fairly and in good faith.

The efforts of the plaintiff had been thus unsuccessful. He had not made a bargain, he had failed to bring buyer and seller to an agreement, after having had four months of opportunity, and now his authority was terminated without his having earned commissions. Very plainly he had acquired no right to them and could acquire no right to them from any thing which might happen in the future, unless upon the sole and only ground that the defendant terminated the agency in bad faith and as a device to get the benefit of plaintiff's labors without paying for them. It is difficult to see how that could be maintained, and yet, in his charge to the jury, the trial judge called attention to the claim that on this same 23d of April, Evans, who as broker made the final sale, and who had learned on the street that the Grand Trunk Railway was in the market for steel rails, wrote that fact to the defendant and began the negotiations which ended in a sale. He did write such a letter to Hunt, but it is plain that the latter did not receive it until the 25th at the earliest, and not until after he had terminated plaintiff's agency. He could not, therefore, have been influenced by it, and the evidence of bad faith had nothing left

on which to rest except the fact of the actual sale to the Grand Trunk Railway on the 13th of May, which sale was made through Evans and his brokerage paid.

Keeping in view this state of facts, we are prepared to consider certain other alleged errors in the final disposition of the case. The court was asked to direct a verdict for the defendant on the ground that although the plaintiff had first applied to the defendant for the price of the rails, the defendant was entirely at liberty to refuse his services and make a sale itself, directly or through another broker. The request was refused. We cannot quite say that this was error in view of the possible question of bad faith in terminating the agency. Slender as may have been its foundation, there was, perhaps, enough in the circumstances of the case and the facts of the transaction to make it proper to submit that question to the jury. It was a question peculiarly within their province, and which the court could hardly be justified in withholding from their consideration.

The court was then asked to charge that the defendant, under the circumstances, had the right to refuse to use the services of Mr. Sibbald, if the action was taken in good faith, without any intent to deprive him of his commission. The proposition involved in this request was, as we have already shown, entirely accurate and sound, and should have been so presented to the jury. The trial judge, however, was unwilling to so charge without adding a material qualification. He said, "I charge that proposition, but I charge it with a qualification, that the defendant had no right to refuse to avail itself of those things which the broker had done and then, indirectly — no matter whether in good faith or bad faith — by other channels, avail itself of the efforts of the broker with whom it has declined to continue the negotiation." There was an exception both to the refusal to charge and to the qualification added.

It is apparent that the request and the charge, taken together, plainly instructed the jury two things; first, that a seller cannot, even in good faith, terminate the authority of a

broker, and effect a sale afterward through other agencies, and freed from any liability to the broker, if in the making of such after-sale the latter's previous unsuccessful efforts are in fact useful and aid and assist in the final bargain; and, second, that the circumstances of the case were such as to justify the inference that in the sale actually made the seller did in fact avail himself of the previous labors of the broker. This last proposition, without being distinctly asserted, was plainly assumed as the basis upon which the qualification of the request to charge rested and was rendered necessary. The practical result of the instruction thus given was in hostility to the conclusions we have derived from the authorities. It made immaterial the good faith of the defendant in terminating the authority of the broker, and explicitly denied such right as affecting commissions, if the after-sale was in fact aided and assisted by the plaintiff's previous unsuccessful efforts. The test of the right to recover is changed from the question of the principal's good faith in terminating the agency, to the question whether, notwithstanding that fact, the new and independent sale was helped and benefited by the previous action of the broker. The logical result of such a doctrine would be to prevent the defendant from ever making a sale of steel rails to the Grand Trunk Railway, except on condition of paying a commission to the plaintiff. For the one only useful thing which he did was to introduce the Bethlehem rails to the notice of that railway company. There could be no sale thereafter which would not be as much due to such original act of the broker as the one in question. It could always be said with equal truth that the iron company was availing itself of the fruits of the broker's labor. The doctrine asserted permits a recovery for unsuccessful efforts, for trying to effect an agreement without accomplishing one, for merely asking a purchaser to buy without getting his assent, because though the agency had ended without commissions earned, a later and independent negotiation was probably easier and more likely to succeed by reason of such previous efforts. The charge had a clear tendency to mislead the jury. Because the

broker originally brought the Bethlehem rails to the notice of the Grand Trunk purchasing officers, and thereafter accomplished nothing more than to lessen the principal's price and sell the rails of its rivals to the proposed customer, he is held entitled to recover commissions on a sale made without his intervention and after his agency had been fairly and lawfully terminated. Grant that what he did may justly be said to have aided in the making of the after-sale, yet that does not furnish ground for recovery, as we have already seen. If it did, such an agency might pass utterly beyond the principal's control. The trial judge, in the earlier part of his charge, had stated the general rule correctly, and as we hold it should be. He said to the jury, "If you find from the evidence in any given case, that the broker has failed to carry out any particular transaction, and that his efforts, although he may have introduced the parties, have terminated, and that he has not succeeded in making the trade, then the principal has a perfect right to resort to other sources for the purpose of effectuating that trade." If the charge had stopped here no error would have been committed. But it did not stop here. At its very close, and as the last words left with the jury, the doctrine, before correctly announced, is qualified by the introduction of a new and wrong element which could scarcely fail to lead the jury astray. It not only denied that unearned commissions were finally cut off by a termination of the broker's authority exercised in good faith, but confusing the essentially different ideas of an endeavor to make some sale, and negotiations about a particular sale, assumed that the last existed when the authority terminated, and on that unwarranted assumption asserted the right to commissions on the sale actually made. He should have submitted the question of good faith in terminating the agency to the jury, and told them if they found that fact, that no commissions could accrue on the after-sale, however much in making it the seller availed himself of the previous labors of the broker.

If after the broker has been allowed a reasonable time, within which to produce a buyer and effect a sale, he has

failed to do so, and the seller in good faith and fairly has terminated the agency and sought other assistance by the aid of which a sale is consummated, it does not give the original broker a right to commissions, because the purchaser is one whom he introduced and the final sale is in some degree aided or helped forward by his previous unsuccessful efforts. If the charge was intended to mean this, and no more than this, the language chosen was unfortunate, for its direct tendency was to convey to the jury an entirely different idea and one with which we do not concur. For this error the judgment should be reversed.

Judgment reversed; new trial granted, costs to abide the event.

All concur; except RAPALLO, J.. absent.

Judgment reversed.