(4 App. Div. 32.)

## WARE v. DOS PASSOS et al.

(Supreme Court, Appellate Division, First Department. April 17, 1896.)

REAL-ESTATE BROKER—RIGHT TO COMMISSIONS—PROCURING CAUSE OF SALE.

In an action to recover broker's commissions, it appeared that plaintiff was employed by defendants to sell certain real estate. After an unsuccessful attempt to sell to a bank, through its president, the property was offered to P., but no sale effected. Afterwards, the bank, becoming owner of adjoining property, its directors, knowing nothing of plaintiff's agency, negotiated, through P., with the owners, and made the purchase. *Held*, that there was nothing to show that plaintiff was the procuring cause of the sale, and a motion to dismiss his complaint should have been granted.

Appeal from court of common pleas, trial term.

Action by William R. Ware against Benjamin F. Dos Passos and Robert C. Embree to recover commissions alleged to have been earned by plaintiff by the sale of real estate belonging to defendants. There was judgment for plaintiff, and defendants appeal. Reversed.

Argued before VAN BRUNT, P. J., and WILLIAMS, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

Samuel G. Adams, for appellants.
Robert Weil, for respondent.

O'BRIEN, J. The action is to recover broker's commissions claimed to have been earned by the plaintiff in procuring a purchaser of defendants' real estate in Fulton street, this city. That the plaintiff was employed, and that the property was subsequently sold to the Park Bank, to whose notice it had been first brought by the plaintiff, were established. The crucial question presented is, was there sufficient evidence to justify the conclusion, reached by the jury, that the plaintiff was the procuring cause of the sale?

It appears that, in February, 1893, after being authorized to sell, the plaintiff made a diagram of the property, and offered it for sale to various parties, among others, to a Mr. Russell, and to Mr. Wright, the president of the Park Bank. Plaintiff gave Mr. Wright a dia-

gram of the property, and told him that it could be bought for $100,-000. Mr. Wright, on behalf of the bank, made no offer, and told plaintiff that he did not know that the bank could buy. On February 23, 1893, a Mr. Peabody, who had learned, through Mr. Russell, that the plaintiff had the property for sale, wrote plaintiff a letter. In response thereto, plaintiff had several interviews with Mr. Peabody, and left with him a diagram, and stated to him that he thought the property could be bought for $100,000. Although there is a discrepancy between the plaintiff and Mr. Peabody as to whether the former said the property could be bought for $100,000 or for $115,000, we should take the view most favorable to the plaintiff in determining the question, just as the jury would have the right to do, upon conflicting evidence. That no results from all this followed is conceded, because the plaintiff says he never submitted an offer to the defendant on behalf of the Park Bank or Mr. Peabody, nor did they ever make him any offer. On February 25th, Harnett, another broker, was authorized to sell the property at auction, and on that day it was advertised, and plaintiff knew of the contemplated auction sale on February 27th. Pursuant to the advertisement, the property was offered for sale on March 9th, together with certain property on Ann street, which latter was purchased by Peabody. The amount offered for the Fulton street property being unsatisfactory, it was withdrawn or bid in by the defendants. After the sale, one of the defendants and Mr. Peabody went to Mr. Harnett's office to sign the terms of sale, and Peabody was then introduced to the defendants and urged to purchase the Fulton street property, which proposition he stated he would consider. The plaintiff claims that, before Peabody went to Harnett's office, he told one of the defendants that Peabody was one of those to whom he had been endeavoring to sell the property. A few days thereafter, Peabody, through Harnett, made an offer to the defendants, which was accepted, and a contract signed. Peabody, however, was not the real purchaser; it appearing that the contract, although in his name, was made by him as agent for the Park Bank, to which institution the title, when acquired, was transferred. On the day following the auction sale, the plaintiff called on Mr. Wright, and informed him that the property had not been sold; and it is upon this circumstance that the plaintiff bases the claim that his action was what led to the negotiation which resulted in the buying of the property by the bank. That Mr. Wright did anything as the result of this communication is not made to appear, the fact being that Mr. Wright was opposed to the purchase, as was also the vice president, Mr. Fish, who, after the bank, by vote of the other directors, had concluded to purchase, was the one to whom the matter was referred to complete the sale, and who testified that he first knew of the property being for sale by the posters advertising the auction. He it was who authorized Mr. Peabody to buy for the bank after the auction sale.

It will thus be seen that the only ones the plaintiff claims to have seen with regard to purchasing the property were Mr. Wright and

Mr. Peabody, neither of whom was instrumental in bringing about the purchase, because the former was opposed to it, and the latter merely carried out the orders and directions which he received from Mr. Fish, who was acting pursuant to a resolution procured by the action of the other directors of the bank. The plaintiff's whole connection, therefore, with the transaction, is that, prior to the auction sale, he had called the attention of Mr. Wright and of Mr. Peabody to the fact that the property was for sale; and he admits that neither of them made any offer, nor did he ever communicate to the defendants that he was negotiating with the Park Bank, though he does say that, on the day of the auction, he notified one of the defendants that he had been negotiating with Mr. Peabody. The latter, however, was not buying for himself, and he was by no means the active cause of producing a purchaser; the bank's action being based entirely on the views of the other directors, unaffected by anything Mr. Peabody said or did, for it does not appear that, in that connection, beyond speaking with Mr. Wright, he did anything but carry out the directions of Mr. Fish after the bank had concluded to purchase. Upon such evidence, we do not think the plaintiff has shown that he was, in a legal sense, the procuring cause of the sale.

In Gerding v. Haskin, 141 N. Y. 514, 36 N. E. 601, it is said:

"Before a real-estate broker can recover his compensation, he is bound to prove that he found a purchaser, and produced him to his principal, ready and willing to purchase the real estate upon his terms."

And in Smith v. McGovern, 65 N. Y. 574, the court, in defining "procuring cause," said:

"It means the original discovery of a purchaser by the plaintiff, and the starting of a negotiation by the plaintiff, together with the final closing by or on behalf of the defendant, with the purchaser, through the efforts of the plaintiff."

Even though it is possible that the plaintiff at one time brought the attention of an officer of the bank to the property, it is clear that he neither started a negotiation which was successful, nor through his efforts was there a sale effected to the bank. An opportunity had been given him to sell the property, and though he brought it to the notice of Mr. Wright, the president of the bank, no results followed, because we find the defendants resorting to the auction sale as a means of procuring a purchaser; and it is reasonably certain that what induced the action of the directors of the bank in purchasing was the fact that, having purchased the Ann street property, it was deemed important that the bank should also own the property on Fulton street. At the time of such auction sale the plaintiff's efforts had failed; and where, as here, the defendants had no knowledge that the bank had had their attention called to the property by the plaintiff, they had a perfect right, acting in good faith, to open negotiations through another broker, or by their own efforts, with that institution, through Mr. Peabody or anybody else, without rendering themselves liable to commissions at the hands of the plaintiff. Unless this is true, the effect of con-

fiding a sale to a broker, who is active in bringing the property to the attention of a number of people, would be to give such broker a lien on the property for all time, and enable him, whenever the property was sold, to demand compensation, provided it then appeared that the seller had closed a bargain, without knowing it, with one whose attention the broker had at some time called to the property.

We think a case more like to this in principle is that of Sibbald v. Iron Co., 83 N. Y. 378. There the defendant employed the plaintiff, a broker, to sell rails of its manufacture to a company. After unsuccessful negotiations, carried on for months between that company and the plaintiff, the company sent direct to defendant, asking upon what terms a certain quantity of rails would be delivered, and plaintiff telegraphed to defendant asking its lowest terms. Defendant declined to fix a price or negotiate further through the plaintiff, and the latter thereupon telegraphed the company that the defendant declined to name a price. Subsequently a sale was made by the defendant to the company through another broker. Thereupon the plaintiff sued the defendant for his commissions, and in the course of the opinion the court said:

"The broker may devote his time and labor, and expend his money, with ever so much of devotion to the interests of his employer, and yet if he fails, —if, without effecting an agreement or accomplishing a bargain, he abandons the effort, or his authority is fairly and in good faith terminated,—he gains no right to commissions. * * * And in such event it matters not that, after his failure, and the termination of his agency, what he has done proves of use and benefit to the principal. In a multitude of cases that must necessarily result. He may have introduced to each other parties who otherwise would never have met. He may have created impressions which, under later and more favorable circumstances, lead to and materially assist in the consummation of a sale. He may have planted the very seeds from which others reap the harvest. But all that gives him no claim. It was part of his risk that, failing himself, not successful in fulfilling his obligation, others might be left to some extent to avail themselves of the fruit of his labors."

This statement, as pointed out by the court, is subject to the exception that the failure of the broker is not caused by the fault of the principal, and that, while the right of the principal to terminate the agency at will exists, that is subject to the requirement of good faith. It is not suggested that there was any attempt to overreach this plaintiff, or to act in bad faith by these defendants, who never knew that the plaintiff had brought the property to the attention of the bank, and who had a right to assume that he was unable to procure a purchaser, because they thought it necessary, in order to secure a purchaser, to put it up at auction.

It will thus be seen that we have spent little time in discussing the negotiations between the other broker and Mr. Peabody, because what was done with him had little to do with bringing about the sale; the evidence showing that the directors of the bank reached their conclusion after the auction sale, and they might just as well have selected their cashier or anybody else, as Mr. Peabody, for the purpose of acting as their agent in carrying their offer to the defendants and consummating the sale.

Upon plaintiff's own evidence, therefore, having reached the conclusion that there was not sufficient from which the jury could legally infer that the plaintiff was the procuring cause of the sale, it was error not to have granted the motion of the defendants, at the close of the plaintiff's case, to dismiss the complaint.

The judgment should therefore be reversed, and a new trial ordered, with costs to the appellants to abide the event. All concur.