RENE ARACHTINGI, Respondent, *v.* M. STANLEY TWEEDIE and S. HAROLD FREEMAN, Appellants.

(Supreme Court, Appellate Term, First Department, June, 1918.)

Ships and shipping — sale of vessel — broker's commissions.

> The evidence in an action to recover broker's commissions on the sale of a vessel considered, and *held*, that the submission to the jury of the question whether plaintiff was the procuring cause of the sale was unauthorized, and no claim being made that in fulfilling a contract of the sale of the vessel to others the defendants, whose ownership was by way of a mortgage on the vessel which had been transferred in blank to a firm which at the time of the trial was the holder thereof, had not acted in good faith, the complaint should have been dismissed.

APPEAL by defendants from an order of the City Court of the city of New York denying their motion made on the judge's minutes to set aside the verdict and for a new trial.

Appellate Term, First Department, June, 1918. [Vol. 103.

John T. McGovern, for appellants.

Henri Pressprich (George P. Foulk, of counsel), for respondent.

Guy, J. The plaintiff has recovered judgment in this action to recover broker's commissions on the sale of a sailing vessel. Appellants contend no case was established for submission to the jury and that the complaint should have been dismissed.

Plaintiff's testimony in substance is as follows: In August, 1917, plaintiff was authorized by Lelange Bonnaire, of Martinique, W. I., to offer $20,000 for the vessel on certain conditions, and on August twenty-first he communicated this offer to defendant Tweedie, who said he would not take $20,000 but would be willing to sell the vessel for $23,000 and would pay five per cent commission on the sale. On the same day plaintiff cabled to Martinique that defendants would take $23,000, but from August twenty-first until September twenty-ninth plaintiff got no reply to his cable. On September twenty-ninth plaintiff received a postal card dated at Porto Rico from a man named Herreson, who wrote that plaintiff's address had been given to him by Lelange Bonnaire, who referred Herreson to plaintiff, and that Herreson would be in New York the following Wednesday. On the receipt of the postal card plaintiff telephoned Tweedie he would have a man from Martinique in New York in a few days and he probably would have some news about the vessel. Herreson arrived in New York October ninth with a letter of introduction to plaintiff from Bonnaire, and, on the evening of that day or the next, plaintiff, Herreson and Tweedie met in Tweedie's office, plaintiff before the meeting telephoning Tweedie that it was to be understood that whatever price was

made to Herreson would include the plaintiff's commission, to which Tweedie assented. When the parties met Herreson, after some preliminary questions regarding the vessel, asked Tweedie what he wanted for it, to which the latter replied he was asking $25,000 whereupon Herreson said he would not decide anything immediately but would see Tweedie the next day. On October twelfth the same parties again met in Tweedie's office, and Herreson offered $23,000. Tweedie thanked him for the offer, said he thought he ought to get $25,000, but promised to submit the offer to his partner without any recommendation and would let Herreson know the following day; and on October fifteenth Tweedie telephoned plaintiff that his partner did not care to accept the offer, and that he would not recommend it himself at less than $25,000 and asked whether that would call the deal off. The plaintiff then got Herreson on the telephone " and Herreson said ' Tell him we won't do anything now,' which I repeated to Tweedie. At the same time Herreson told me he was writing to Martinique for a little further information and he might let Tweedie hear later."

Plaintiff further testified that on October twenty-fifth he received a cable intended for Herreson which advised plaintiff that Herreson had received $10,000 through the National Park Bank with which to close the deal on the vessel; that plaintiff did not see Tweedie again until the end of October, when the latter told plaintiff the vessel would sail for France, whereupon plaintiff said that he was the agent of the French Steamship Company, which has its offices at Nantes, and asked Tweedie if he wanted to consign the vessel to the company; that Tweedie replied " Why not, offer them the vessel and see if they would not buy it; send them a cable, go as far as you like," the owner agreeing

to pay plaintiff a commission of $2,000 if plaintiff sold to the company; that plaintiff accordingly cabled to the company at Nantes and on November fifth, sixth and seventh Tweedie telephone plaintiff asking whether he had an answer to the cablegram; that on November ninth Herreson called on plaintiff and on the following day the latter telephoned Tweedie he had heard Herreson had bought the vessel and expressing the hope that Tweedie had taken care of plaintiff's commission; that Tweedie answered no, that defendants had already paid one commission and could not afford to pay two commissions, and that he did not know who the principal was in the transaction.

James B. Badeau, a witness called by the plaintiff, testified that he was a clerk employed in the office of Middleton & Co.; that on November eighth or ninth the witness accompanied Herreson to the office of J. F. Whitney & Co.; that they met Tweedie there and that there and then the parties came to final terms, the contract being drawn up later; that the commissions were deducted from the purchase price; that Middleton & Co. represented Herreson, who did not appear in the transaction until the day he went to Whitney's office; that the deal had been closed the day before, but that a question arose concerning a leak which had been discovered in the vessel, and to adjust that the parties, including Herreson, met at Whitney's office, the final adjustment being $24,000 after deducting $1,000 on account of the leak.

A representative of J. F. Whitney & Co., ship brokers, testified that he saw Tweedie and also saw Middleton with reference to the sale of the vessel; that as a result of the negotiations he delivered to Middleton & Co. a mortgage or badge of title under which the vessel was held; that he at no time disclosed to Tweedie that he represented any other person or persons but

Middleton & Co.; that the selling price of the vessel was agreed upon at $25,000 but it was found after the price had been agreed upon that there was some defect, some leak in the ship, for which an allowance of $1,000 was made subsequent to the date of the confirmation of the sale; that freight and other matters were also adjusted, and when the transaction was finally wound up checks for $7,408 were passed in final payment; and that the witness never heard of Herreson in the transaction.

It further appeared that the defendants being American citizens could not take title to the vessel, and that their ownership was by way of mortgage on the vessel, which mortgage was transferred in blank to Middleton & Co., that firm being the holder of such mortgage at the time of the trial.

A careful consideration of the evidence, ignoring the testimony of the defendant Tweedie in so far as it is favorable to the defense, leads to the conclusion that the defendants' motion to dismiss the complaint should have been granted. The best that plaintiff could do with Herreson was to bring him up to $23,000; after that offer was rejected Herreson said "We won't do anything now," and plaintiff so informed Tweedie; it was then that the plaintiff took up with Tweedie the question of selling the vessel to the French company, but nothing came of that. To hold that after October fifteenth Tweedie was prevented from making a sale except through the plaintiff and to Herreson would be contrary to the authorities. Tweedie had no reason to believe that Herreson would pay $25,000 and it was apparently so understood by plaintiff for he acquiesced in that defendant's suggestion to offer the vessel to the French company for $25,000, his efforts in that regard proving fruitless. The learned trial judge correctly charged the jury that defendants had the right to

terminate the agency at any time if the offer had not been complied with, and there is nothing in the case which required that such termination should be communicated to the plaintiff. It appears without contradiction that Tweedie did not know that Herreson was interested in the sale until after the terms had been agreed upon, that the sale was to an undisclosed principal; but even if the sale were made through Whitney & Co., the brokers, directly to Herreson the record does not fix liability on the defendants. The broker " may have introduced to each other parties who otherwise would have never met; he may have created impressions which, under later and more favorable circumstances, naturally lead to and materially assist in the consummation of a sale; he may have planted the very seeds from which others reap the harvest; but all that gives him no claim. It was part of his risk that failing himself, not successful in fulfilling his obligation, others might be left to some extent to avail themselves of the fruit of his labors. As was said in *Wylie* v. *Marine National Bank* (61 N. Y. 416), in such case the principal violates no right of the broker by selling to the first party who offers the price asked, and it matters not the sale is to the very party with whom the broker had been negotiating. He failed to find or produce a purchaser upon the terms prescribed in his employment, and the principal was under no obligation to wait longer that he might make further efforts. The failure, therefore, and its consequences were the risk of the broker only." *Sibbald* v. *Bethlehem Iron Co.,* 83 N. Y. 378, 383.

Assuming that Herreson was the purchaser of the vessel, the plaintiff in this instance planted the very seeds from which Whitney & Co. reaped the harvest; but that gave him no enforceable claim against the defendants for commissions.

The situation is similar to that presented in *Freed-man* v. *Havemeyer,* 37 App. Div. 518.    There the owner of real estate, who had authorized a firm of brokers to sell it for $300,000, was approached by another firm of brokers who offered $275,000 for it, which offer was declined, the owner stating that he would take $290,000.    Thereafter a member of the second firm of brokers informed the owner that he was negotiating for a sale of the property to " Frederick G. Jennings on behalf of Mr. McCullough and for himself as one of the heirs, or rather on behalf of his wife and other members of the Trenor Park estate," to which the owner replied " I have no negotiations with those people; you may go on, and if I sell them the property you will be entitled to a commission."    At a later interview the owner informed the same broker that $295,000 was the lowest price he would take.    Subsequently, however, the owner, through the first-mentioned firm of brokers, entered into a contract for the sale of the premises for $275,000 to one Edward C. Wilde, who he supposed was acting for himself, but discovered when the time arrived for the delivery of the deed that he was acting on behalf of Frederick G. Jennings and John G. McCullough, and the conveyance was made to them.    The case was submitted to the jury, which awarded plaintiffs a verdict, and the judgment entered thereon was reversed on appeal, the appellate court holding that the complaint should have been dismissed.    The court said (pp. 520–521) : " But it is said they [plaintiffs] were negotiating with Mr. Jennings, one of the persons to whom the conveyance was subsequently made, and that while negotiations were pending, the defendant made the sale.    What of it?    The defendant did not know it, and if he did it would have made no difference; because such negotiations had not resulted in an actual, or even a prospec-

Appellate Term, First Department, June, 1918. [Vol. 103.

tive, agreement, and the permission to sell at $285,000 was not an exclusive one, or for a fixed time, and it did not prohibit the defendant from selling to others if the sale was made in good faith. A person may place his property with as many brokers to sell as he sees fit, but it is only the one who produces a buyer ready and able to purchase on the employer's terms, that becomes entitled to commissions. Here the sale was actually made by Harnett & Co. The plaintiffs had nothing to do with it. They were not connected with the contract or conveyance in any way. Indeed, the plaintiffs did not know until just before the action was tried, as appears from an application to amend the complaint, to whom, in fact, the conveyance was actually made. The defendant, in the absence of anything showing bad faith on his part, had a right to sell through Harnett & Co., and there is nothing in the record to show that in entering into the contract with Wilde, or in executing the conveyance in fulfillment of it, he did not act in good faith, or that he intended to defraud the plaintiffs or injure them in any way.''

Under the circumstances the submission to the jury of the question whether the plaintiff was the procuring cause of the sale was unauthorized, and as it is not claimed that in entering into the contract through Whitney & Co., and in fulfilling the same the defendants did not act in good faith, the complaint should have been dismissed.

Judgment and order reversed, with costs, and complaint dismissed, with costs.

BIJUR and WEEKS, JJ., concur.

Judgment and order reversed, with costs.