## JACKSON v. NORTHWESTERN MUT. LIFE INS. CO.
### No. 5018.

Circuit Court of Appeals, Fourth Circuit.

Feb. 11, 1943.

112

Guy Weaver, of Asheville, N. C., for appellant.

Kester Walton, of Asheville, N. C. (Harkins, Van Winkle & Walton, of Asheville, N. C., on the brief), for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This is a civil action instituted by L. B. Jackson (hereinafter called Jackson) against The Northwestern Mutual Life Insurance Company (hereinafter called the Company) for the recovery of $5,000 allegedly due Jackson by reason of a special contract made between Jackson and one H. R. Murphy on behalf of the Company.

At the close of the evidence, the District Court granted the Company's motion for a directed verdict in its favor. From this judgment Jackson has duly taken an appeal to this Court. We are here concerned with the single question of the propriety of the District Court's action in directing a verdict for defendant. This involves an examination of the record in the instant case to determine whether sufficient evidence was introduced to require a submission to the jury of the question of the contract between the parties. In presenting the facts, we shall consider the evidence in the light most favorable to Jackson, granting him the benefit of every reasonable inference to be drawn therefrom.

In 1939 the Company owned certain property known as the Ivey Building in Asheville, North Carolina. On October 23, 1939, H. R. Murphy, Superintendent of Real Estate Sales for the Company, came to Asheville and conferred with Jackson concerning the possible sale of the Ivey Building. During the course of the meeting, Murphy specifically advised Jackson that the only authority Murphy had in connection with the sale of this property was to accept proposals on behalf of the Company. Accordingly, no agreement binding on the Company could be made by Murphy concerning the selling price of the property, the terms of the sale, or the commission to be paid, until these matters were submitted to the Company at its home office in Milwaukee, Wisconsin, for official approval and acceptance by the Finance Committee of the Company. Jackson admittedly was aware of Murphy's limited authority in connection with the property and he so testified.

After having reached this complete mutual understanding regarding the restricted power of Murphy to bind the Company, the parties agreed that in the event the property was sold by Jackson to one G. Green of Asheville (a prospective purchaser Jackson had in mind), Murphy would recommend to the Finance Committee that Jackson receive a commission of $5,000. Jackson contends he was to receive $5,000 irrespective of the selling price, the terms of the sale, or the time within which the

property was sold to Green. Unusual as this arrangement may sound, we accept it as a correct version of the facts for the purpose of this appeal.

Later, on the same day of the original meeting, October 23, 1939, Murphy and Jackson went to the office of Green, where the latter indicated his willingness to pay $330,000 for the property. Murphy, however, insisted that he would not recommend or submit to the Company an offer of less than $390,000. As a result of this great discrepancy between these respective selling prices, no agreement was then reached between the parties. Jackson concedes that this was the only time he ever conferred with Murphy.

Immediately after this meeting, Jackson and Murphy both left Asheville and Jackson admittedly, from October 23, 1939, to January, 1941, did not communicate with Murphy or the Company concerning the sale of the property to Green or to any other person. Jackson also testified that he did not receive an offer from Green for the purchase of the property after October 23, 1939, and also that he made no efforts to interest Green in the Building except to tell Green that whenever he wanted to buy it, Jackson would "go to work on it". Jackson also knew that he did not have an exclusive listing on the property since he was aware of the fact that Murphy had listed the Building with other brokers in Asheville for the purpose of receiving offers of sale.

The property was finally sold to Green on or about January 15, 1941. All the negotiations leading up to and ending in the actual sale were carried on by Miss Flowers, a real estate broker in Asheville. Here again Jackson admits he had nothing whatsoever to do with the negotiations between Miss Flowers and Green and the subsequent sale to Green by the Company. Neither did the Company, nor anyone on its behalf, ever communicate with Green relative to the sale of the property after October 23, 1939, until the offer was received through Miss Flowers in January of 1941. A commission of $3,750, agreed to by Miss Flowers and approved by the Finance Committee on behalf of the Company, has been paid to Miss Flowers.

When Jackson received notice of the sale to Green, he immediately sent a telegram to the Company demanding the payment of the $5,000 commission purportedly due him in accord with the alleged special contract of October 23, 1939. Upon the refusal of the Company to pay Jackson this sum, the present suit was instituted.

In the light of the foregoing facts, we are of the opinion that the District Court was correct in granting a directed verdict for the Company. Jackson seeks to hold the Company liable pursuant to an alleged express contract which is most indefinite and unusual in its terms and, even if it was entered into by Murphy, the agreement had never been accepted or confirmed by the Company through its Finance Committee. Jackson, however, asserts that proof of such ratification by the Company is not necessary under the doctrine that a principal is bound by *all* acts committed by his agent within the scope of his apparent authority. It is unnecessary to cite authority for this elementary hornbook rule of law. But Jackson's case must fall because the doctrine does not cover the instant situation. We fail to see how Jackson could even assert its application in view of the fact that he admitted in his own testimony that he was fully aware of the restricted power of Murphy to bind the Company. And it is well settled that a principal will not be bound by the acts of the agent in excess of his actual authority, where the third party has knowledge of the precise extent of the agent's authority. Accordingly, while we cordially agree with Jackson's theory of the law, it is foreign to the facts of the case before us.

Finally, there is a stronger and even more compelling reason for affirming the judgment of the District Court. Jackson simply was not the procuring cause of the sale of the property. Green testified, without contradiction, that the transaction was consummated entirely through the persistent efforts of Miss Flowers alone. Indeed, Jackson had impliedly abandoned his attempt to sell the Building, having taken no material steps in that direction in the 14 months' period from October, 1939, to January, 1941. He thus remained dormant despite his own admission that he "knew he had competition" from other brokers in Asheville with whom the property was listed.

The law is abundantly clear that although Jackson was interested in the sale of the property and had a finger in the pie, his preliminary efforts do not rise to the dignity of an enforceable contract. We

feel that the following quotation expresses the relevant law of North Carolina and adequately controls the instant case: "It follows, as a necessary deduction from the established rule, that a broker is never entitled to commissions for unsuccessful efforts. The risk of failure is wholly his. The reward comes only with his success. That is the plain contract and contemplation of the parties. The broker may devote his time and labor, and expend his money with ever so much of devotion to the interests of his employer, and yet if he fails, if without effecting an agreement or accomplishing a bargain, he abandons the effort, or his authority is fairly and in good faith terminated, he gains no right to commissions. He loses the labor and effort which were staked upon success. And in such event it matters not that after his failure, and the termination of his agency, what he has done proves of use and benefit to the principal. In a multitude of cases that must necessarily result. *He may have introduced to each other parties who otherwise would have never met;* he may have created impressions which, under later and more favorable circumstances, naturally lead to and materially assist in the consummation of a sale; *he may have planted the very seeds from which others reap the harvest; but all that gives him no claim. It was part of his risk that failing himself, not successful in fulfilling his obligation, others might be left to some extent to avail themselves of the fruit of his labors.*" (Italics ours.) Sibbald v. Iron Co., 83 N.Y. 378, 385, 38 Am.Rep. 441.

This case received the approval of the Supreme Court of North Carolina in Abbott v. Hunt, 129 N.C. 403, 40 S.E. 119.

■ A more recent statement may be taken from McCoy v. Trust Co., 204 N.C. 721, 722, 169 S.E. 644, 645: "A broker who undertakes to negotiate a sale of property is not entitled to commissions unless he finds a purchaser who is ready, able, and willing to complete the purchase on the terms agreed upon by him and the vendor. The right to commissions depends on the successful performance of the broker's services, and nothing is to be paid unless a bargain is effected. A prospective agreement is not sufficient."

Accordingly, under the admissions of Jackson and the uncontradicted evidence in the case, we are of the opinion that the court below properly directed a verdict in favor of the Company. We restrict our decision to the precise action before us, namely, a suit on an express contract for commissions. Jackson did not seek a recovery on a quantum meruit basis for services rendered.

The judgment of the District Court is affirmed.

Affirmed.