## WEST *v.* DEMME.

1. BROKERS — ACTION FOR COMMISSIONS — EVIDENCE — QUESTIONS FOR JURY—INSTRUCTIONS.

In an action for commission on a sale of mining property, plaintiff testified that he contracted in writing with defendant to find a purchaser for the property, or to effect the organization of a company satisfactory to defendant to take it over, for which he was to receive a specified commission; and that such contract was afterwards delivered to defendant at his request, and not returned. He further testified that it was the understanding that defendant was to realize at least $75,000 in cash out of the transaction. It appeared that plaintiff endeavored to interest C. in the property, and arranged with him to examine it, but took no part in any further negotiations. He testified, however, that C. told him that, if the property should prove to be as represented, he would assist in organizing a corporation to take it on terms as favorable as those proposed by defendant. C. visited the property, and subsequently a corporation was organized, C. subscribing for a large amount of the stock; but both he and defendant testified that such subscription was in the interest of defendant, and that the organization of the company was not brought about by C., but was effected by defendant himself, with the assistance of another broker. Defendant received no cash out of the arrangement. *Held:*

(1) That the question whether plaintiff, through C., brought about the organization of the corporation, was for the jury.

(2) That it was also for the jury to say whether it was a part of plaintiff's undertaking that defendant should realize $75,000 in cash out of the disposition of the property.

(3) That, if such was the contract, and defendant was unable to induce C. to proceed on those terms, defendant had the right to abandon the scheme, and to organize a corporation on different lines.

(4) That, under the circumstances, it was error to refuse an instruction that "the duty of the broker is to bring the buyer and the seller together, and effect a purchase of the property according to the terms agreed upon by the seller and the broker; the broker is not entitled to a commission for unsuccessful efforts to effect a sale."

2. SAME.

In an action to recover an agreed commission on a sale of real
estate, evidence of negotiations between plaintiff and those
other than the purchaser, whom he claims to have procured, is
inadmissible.

Error to Wayne; Frazer, J.   Submitted February 12,
1901.   Decided July 19, 1901.

*Assumpsit* by George M. West against Rodolph A.
Demme for commissions on a sale of real estate.   From a
judgment for plaintiff, defendant brings error.   Reversed.

*S. S. Babcock (Philip T. Van Zile,* of counsel), for
appellant.

*Edward W. Pendleton (Otto Kirchner,* of counsel),
for appellee.

MONTGOMERY, C. J.   The plaintiff recovered a verdict
of $55,000, which is the amount of a commission claimed
to have been earned on the sale of a mining property
owned by the defendant, with interest.   The evidence
shows that the defendant was interested in mining prop-
erty in Ontario, known as A. L. 74, 75, and 76, and other
claims in the Rainy river district, and also known as the
Foley-Weigand property.   The property was a gold mine,
partially developed.   It was not yet equipped with a
stamp-mill; and defendant, Demme, had, in the fall of
1895, invested in this property some $75,000.   Plaintiff
and defendant were then friends.   Both were residents of
Detroit.   Plaintiff was a broker.

In the fall of 1895, defendant told plaintiff of his situa-
tion; that he had invested more in this property than he
had expected; that he was very anxious to get out, and
had a scheme for organizing a land-improvement company
to take over the property, develop it in part, and sell out
certain of the claims.   With this end in view, he expressed
himself as willing to organize a company with a capital
stock of $500,000, with shares at $1 each, of which 300,000

should be issued to defendant, and 200,000 left in the treasury, and, of the 300,000 issued to defendant, a sale was to be made of 150,000 at par.   The plaintiff, believing that through his Eastern connections he would be able to sell this mine or place the stock, entered into an agreement with defendant with that in view.   What the terms of that agreement were rests upon the testimony of the two parties.   The plaintiff testified that, in addition to a paper containing an elaborate description of the mining property owned by defendant, and a statement of the terms upon which he was willing to organize a company, an additional paper was given to the plaintiff, which was later returned to Mr. Demme, the defendant, and which is not now pro-duced.   He states that the paper authorized him to place the Foley-Weigand property, known as A. L. 74, 75, and 76, upon the market, and to form a land-improvement company to take this property for development, and after-wards take in other property, and that for placing this property upon the market $50,000 commission was to be paid.   On further examination, he testifies that this letter contained a proposition to organize a land-improvement company, and, if that could not be done, "to effect the organization of a company which would—to effect the organization of this property." He further testified as follows:

"*Q.* Who was to effect the organization ?
"*A.* I was.
"*Q.* *You* were to effect the organization ?
"*A.* I was to find some one who would effect the organization with me.
"*Q.* Was that substantially all there was in that paper ?
"*A.* For the formation of this company, $50,000 com-mission was to be paid.
"*Q.* For what were you to receive the $50,000 ?
"*A.* For placing upon the market this Foley-Weigand property, or to effect an organization to operate it.
"*Q.* Were you to effect the organization ?
"*A.* No; not personally.
"*Q.* Then why do you say to 'effect an organization ?'
"*A.* To help effect one.

"*Q.* What do you mean by to help effect an organization?

"*A.* Find some one in the East who would form a company.

"*Q.* Is that what you mean by it?

"*A.* I do."

On cross-examination he testified as follows, referring to the original talk about plaintiff's going East to sell the property:

"*Q.* What did you tell Mr. Demme at that time?

"*A.* I told him I thought I could sell it.

"*Q.* Were you to sell the mine,—was that the arrangement?

"*A.* I was to find a purchaser.

"*Q.* You were to find a purchaser for the mine,—for the whole of the property?

"*A.* Yes, sir.

"*Q.* Then, in that talk, it was not that you were to organize a company, but you were to sell the mine?

"*A.* It was to place the property upon the market; that is what it was.

"*Q.* What do you mean by placing it upon the market, —offer it for sale?

"*A.* Yes, sir; or organize a company in any way.

"*Q.* Do you mean organize a company or offer it for sale?

"*A.* Both; to place it on the market means both, in the broker's business.

"*Q.* Which were you to do,—to sell it, or place it on the market and organize a company?

"*A.* That is what I was to do, put it on the market.

"*Q.* What do you mean by putting a mine upon the market? Do you mean that you were to go down to Boston, and tell the people down there that you had a mine to sell? Do you call that putting it on the market?

"*A.* No, sir.

"*Q.* Do you call putting it on the market, visiting Head & Co., and showing them that you had got a mine, and a lot of assays and blue prints, and saying that you wanted to sell it to them? Do you mean that is putting it upon the market?

"*A.* No, sir; I mean finding a man who will do that, who will agree to do that,—put it on the market.

"*Q.* It is not you who were to put it on the market,—it is the other man ?

"*A.* I was to find a purchaser for it, or somebody who would put it on the market.

"*Q.* There are two propositions; you are to find a purchaser for it, and a man that will put it on the market. Just what do you mean ?

"*A.* To put a property upon the market, in a broker's sense, means to find a customer to buy it outright, to organize a company, or to take it off the hands of the people who want to sell it.

"*Q.* That is, it means either of those two things ?

"*A.* Yes, sir.

"*Q.* Then, if I understand you, you were either to find a man who would take that mine and pay for it in money—

"*A.* Yes, sir.

"*Q.* Or you were to find a man who would organize a company who would pay for it ?

"*A.* Yes, sir.

"*Q.* I understood you to say on your direct examination that, at the time Mr. Demme sent you there, he was hard up for money ?

"*A.* Yes, sir.

"*Q.* Was that the idea of selling his property ?

"*A.* To a certain extent; yes.

"*Q.* What do you mean by, 'To a certain extent?' Was that the idea, because he was hard up he wanted to sell his mine ?

"*A.* Well, I don't know about that.

"*Q.* You testified something about it. What did you mean by that ?

"*Mr. Kirchner :* By what ?

"*Judge Van Zile :* That Mr. Demme was hard up, and wanted to dispose of his property.

"*The Witness :* That is right. That was the idea of my going East to sell it,—that I could get for Mr. Demme some money.

"*Q.* How much money were you to get for Mr. Demme ?

"*A.* No stipulated amount.

"*Q.* Was there not anything said about how much money you were to get for him ?

"*A.* A company was to be organized—

"*Q.* Not that a company was to be organized. Mr. Demme was hard up, and wanted to sell his property to get some money, and you and Mr. Demme talked that over ?

"*A.* Yes, sir.

"*Q.* How much money?

"*A.* At that time he was willing to take what he put in it.

"*Q.* How much did he put in it?

"*A.* He said $75,000. He was willing at that time—between Christmas and New Year's—to take $75,000. At that time the talk was that I was to go East and find a purchaser, or organize a company so that he would get $75,000 at least. That was what I was going East for.

\* \* \*

"*Q.* Then, as I understand, you, by this paper, were to form a company to put this mining property upon the market, upon terms acceptable to Demme?

"*A.* Yes, sir.

"*Q.* And, if you did that, you were to have your commission?

"*A.* It was to form a land-improvement company, to place the property.

"*Q.* To form a land-improvement company; it was not to sell the mine?

"*A.* He did not want to sell the mine at first, but I told him afterwards a land-improvement company could not be floated.

"*Q.* Then the agreement you made with Mr. Demme was not to sell this property, but to form a land-improvement company?

"*A.* To take this property and develop it as a mine.

"*Q.* To take this property and develop it, and form a land-improvement company?

"*A.* Yes, sir.

"*Q.* This land-improvement company was to take this mine and develop it?

"*A.* Yes, sir; that is it.

"*Q.* Let me see if we understand the matter. You were to go down to Boston, find people there that would organize a land-improvement company, and that land-improvement company was to take this land and develop it. Is that it?

"*A.* That is it.

"*Q.* It was not, then, to form a mining company?

"*A.* No, sir.

"*Q.* And it was not a company to sell the mine?

"*A.* Not at that time.

"*Q.* So the arrangement you made with him here had nothing particularly to do with this mine?

"*A.* It had; it amounted to that.

"*Q.* And he wanted 51 per cent. of the stock of the land-improvement company ?

"*A.* He did.

" *Q.* You told him he could not get it ?

" *A.* I told him I did not think it could be done.

" *Q.* Did you ever form any land-improvement company?

"*A.* I did not.

" *Q.* There has never been any formed ?

" *A.* Not a land-improvement company.

" *Q.* He never got any stock from any such company that you know of ?

" *A.* I don't know.

" *Q.* You don't know of any such thing ?

" *A.* I don't.

" *Q.* Was he to get his $75,000 out of that deal ?

" *A.* He had hoped to.

" *Q.* Was that what you went down there for, to get out of that deal $75,000 ?

" *A.* Yes, sir.

" *Q.* Then that was one of the stipulations added to the arrangement ?

" *A.* No, sir.

" *Q.* Not in writing, but understood ?

" *A.* It was.    *    *    *

" *Q.* How were you to get your commission out of the sale ?

" *A.* When I found some one—

" *Q.* How were you to get it,—out of the sale ?    Were you to get it out of the sale of the property ?

" *A.* Yes, sir.

" *Q.* How ?    In money or in stock ?

" *A.* It was not stated.

" *Q.* You know, don't you, from the talk you had ?

" *A.* I expected to get it in cash.

" *Q.* Then, if I understand you, you were to go down to New York and sell this property so that he could get $75,000 for his property.    Out of that he was to pay you $50,000 for your commission ?

"*A.* To find people who would put—

"*Q.* Is that so ?

"*A.* Not exactly.

"*Q.* If you didn't sell the property, or if you didn't organize a company that would do these things to the satisfaction of Demme,—and he explained what would be

128 MICH.—2.

satisfactory,—you did not expect to get a commission, did you ?

" A. Certainly.

" Q. You expected to get it anyway ?

" A. Certainly.

" Q. Then all you had to do was to go down to Boston, speak to the people, and tell them that you had a mine to sell, and you would get a commission ?

" A. Provided they took it up.  *  *  *

" Q. Is not that the fact,—that you went down there to raise money ?

" A. Yes, sir; if I said so. Mr. Demme was hard up at the time I left, and he sent me down there to sell this property, and raise him some money, and he was willing to take what he had put into the property ($75,000) if he could get the money for it, provided he got stock in addition to that seventy-five."

Plaintiff visited Boston, and, later, New York, and had negotiations with various parties, but with none of them did he have any degree of success, except with a Mr. Frederick G. Corning, an engineer and mining expert of New York City. He testifies that Mr. Corning would have nothing to do with the property in its then condition, or until an examination had been made by an Eastern expert, or by an expert named Farish, living in Colorado. But he further testifies that Mr. Corning agreed that in case the property was found, upon examination, to be as represented, he would assist in organizing a company to take the property on terms as favorable as those proposed by defendant. The visit resulted, however, in no other arrangement than the employment of Mr. Corning to visit the mine, and make a thorough examination and report of the same, for which he (Corning) was to be paid $1,500 and expenses by defendant. Plaintiff thereupon came home. Corning visited the property, and made his report. Further examinations and tests were made, and, finally, in the spring of 1896, a corporation was organized, with a nominal capital stock of $1,000,000, of which, however, but $62,000 was paid in by subscribers other than defendant, and this was devoted to clearing up the title to the

property and putting in a stamp-mill; and, in addition to this, the defendant was called upon to put in further sums of money in developing the mine.

The plaintiff's testimony as to the performance of the contract is that already quoted, in substance, and the further statement of a declaration said to have been made by the defendant to him in June, 1896, as follows:

"He told me that a company had been organized; Corning as a director or a stockholder of a $1,000,000 company. He was to receive one-half of the stock, and a certain portion over half was to be put in the name of a man named Hurley, so that it would give Mr. Demme the control. The balance of the stock was to be put on the market. The company was to be 200,000 shares, of $5 each; Mr. Demme getting 100,000 shares. 50,000 of the remaining shares was to be taken at $1 a share, with an option to these people taking the original 50,000,—an option given to take the other 50,000 at $1.50 a share."

The defendant contends that a verdict should have been directed in his favor, as the evidence fails to show that the plaintiff in any way performed his contract. In this connection it should be stated that both defendant and Corning testified that the organization of this corporation was not brought about through Corning, but that the defendant, on visiting New York, found Mr. Corning unwilling to purchase the property, or to recommend it to his particular clients for purchase, and that the defendant himself, through the intervention of another broker and by his assistance, effected the organization. The fact appears that Corning was a subscriber for nearly one-half the stock; but the testimony of both Corning and defendant shows that he became such subscriber for defendant and Foley, his co-owner of the mine, with the exception of a small block, which he was induced to take by Demme, and to become the consulting engineer of the corporation.

There is, certainly, no direct testimony that Corning brought about the organization of this corporation or became the purchaser of the property. It is only by inference from the facts stated that any such conclusion could

be drawn by the jury. With some hesitation we have reached the conclusion that this was a question for the jury. But, as will be seen, the case is an exceedingly close one on its facts, and it remains to inquire whether any error was committed either in the instructions or in the admission of testimony.

The court, in stating the plaintiff's claim to the jury, charged as follows:

"The plaintiff claims that he entered into a contract with defendant, and that the contract was that he should place this mining property upon the market; and in explanation of what that term means, and what was the substance of their contract, he states that he was to form a land company, according to the original terms of the contract, for the purpose of selling this land to this company, and purchasing other lands for improvement; that that idea subsequently was abandoned, and that he was to place this property upon the market in such a manner as should be satisfactory to the defendant, Mr. Demme; that he was to find a purchaser, or try to find somebody that would organize a stock company, and take it off the hands of Mr. Demme in such a manner as would be satisfactory to him. He claims also that this contract was in writing; that it was signed by Mr. Demme, and handed to him; and that he, with other instructions that he had received at the time,—papers containing a description of this mine, and other matters which have been fully presented to you,—entered upon what he understood or claims to be his duty, as the agent or broker of the defendant, to carry out the terms of this contract. He claims that he had possession of this written contract for some time, and that he went to Boston and New York, and negotiated with various people there, for the purpose of disposing of this property on terms satisfactory to Mr. Demme; that at some subsequent time the defendant, Mr. Demme, requested of him the loan of these papers—all of these papers—for the purpose of copying them; and that at that time he turned over to Mr. Demme the contract he claims was made and signed by Mr. Demme, for the purpose of having it copied, and that he never received it back, claiming, therefore, that the contract is still in the possession of the defendant, Mr. Demme. That being the case, according to his story, secondary evidence

of this contract was permitted. In other words, he was allowed to testify as to what this contract contained. He claims that, in accordance with the terms of this contract, he went to Boston, negotiated with a number of people there, and at Boston he met a man named Corning, who was an expert mining engineer, operating for some Boston concern,—among the rest, some firm of which Mr. Head was a member; that he received propositions ultimately, from New York, from this Mr. Corning, and that it was subsequently agreed between the parties that Mr. Corning was to be sent to the mine and make an exploration of the mine as a mining expert, and that it had been agreed by Mr. Corning that he would take hold of the matter, and bring about some arrangement which he agreed to bring about, and that that arrangement was finally, in substance or in fact, consummated; that Mr. Corning was to do this work for the sum of $1,500 and his expenses; that he subsequently made an exploration of this mine, and reported it; and that, through the intervention of Mr. Corning, a company was subsequently formed, which was organized first in the State of New Jersey, and subsequently in the Province of Ontario, and that the terms of the agreement between him and Demme, through the intervention of Mr. Corning, were subsequently carried out, and that, being carried out, as he claims, under the terms of his contract, he would be entitled to recover from this defendant the amount agreed upon in that contract, to wit, the sum of $50,000. This is the plaintiff's case, and this is the position that he has taken in this case. If you should find that there was a contract entered into between these parties, and that that contract has been carried out by the plaintiff according to its terms, and that, in consideration of his carrying out that contract, he was to be paid the sum of $50,000, then he would be entitled to recover that amount at your hands."

The court further charged as follows:

"It is also claimed upon the part of the plaintiff that Mr. Corning was really the man who did this whole work, and that it was through Mr. Corning's instrumentality that all this subsequent change was brought about; and, for the purpose of establishing in your minds that idea, reference has been made to the fact that Mr. Corning acted as a large stockholder in this matter, and became an interested party in the corporation which was subsequently

formed, and which improved and operated this mining property. This is pointed out to you as evidence that it was through the result of the actions of the plaintiff that this matter was brought about."

As the case was put to the jury, the right to recover was made to depend upon the question of whether a corporation was formed by the assistance of Corning; and the fair inference from such charge is that if such a corporation was formed, which was satisfactory to defendant, the plaintiff's contract was performed. This leaves out of view the question of whether the plaintiff's undertaking was to make a sale out of which the defendant would realize $75,000, or organize a corporation from which he would realize that sum. If such was the contract, and defendant, on his visit to Corning, found it impossible to induce Corning to proceed on these terms, or to effect the organization of a corporation on these terms, the defendant had the right to abandon his scheme, and to proceed to organize a corporation on different lines. *Satterthwaite* v. *Vreeland*, 3 Hun, 152; *Sibbald* v. *Iron Co.*, 83 N. Y. 378 (38 Am. Rep. 441).

Whether the contract, as testified to by plaintiff, included such provisions, was, at least, a question for the jury. The interpretation and construction of oral testimony is, in general, for the jury, particularly where the language used is in any way uncertain or ambiguous. It is true the plaintiff says that the commission was to depend upon his effecting a sale or putting the property on the market on terms satisfactory to defendant; but a jury would be entirely justified in finding that an express understanding as to what these "terms satisfactory to defendant" were had been agreed upon, and that the parties contemplated in any event, and as a first prerequisite, that $75,000 be realized for the defendant before the plaintiff would be entitled to a commission. If this should be so found by the jury, the evidence of performance is lacking; for, admittedly, no such organization was had. The fact that plaintiff had been in negotiation with

Corning did not entitle him to complain, unless he succeeded in inducing Corning to organize a company or make a purchase on terms such as were agreed upon between himself and defendant, or unless Demme, taking up the negotiations where West left off, succeeded in doing so, or faithlessly abandoned the negotiations. See *Sibbald* v. *Iron Co., supra.*

There were certain instructions laying down the rule of law as between broker and employer which we think the court should not have overlooked. There was no instruction defining the duty of the broker or his rights. Defendant's fifth instruction should have been given, or its equivalent, as reduced to a form that would apply to the facts of this case. That instruction was as follows:

"The duty of the broker is to bring the buyer and the seller together, and effect a purchase of the property according to the terms agreed upon by the seller and the broker. The broker is not entitled to a commission for unsuccessful efforts to effect a sale."

The action was upon the common counts in *assumpsit.* The bill of particulars was for a commission for services and expenses in promoting and negotiating the sale of the property mentioned, which, by a more specific bill, was made to include negotiations which resulted in the disposal of the property, the negotiations being referred to as having been with Frederick G. Corning. The plaintiff's testimony has been quoted quite at length, and it shows that his only claim for compensation was for a commission under a specific contract, for a stated amount. Yet a large amount of correspondence between the parties, not relating to negotiations with Corning, but with others, was received in evidence upon the ground, as stated by the court, as follows:

"I admitted testimony as to the actions of Mr. West in negotiating the sale of this property for the purpose of permitting him to show, if he could, that he had entered into an arrangement by which this property was to be sold, and that he had done labor in that direction. The

ground upon which that was admitted was that the declaration in this case was upon the common counts. The bill of particulars does not, as I look at it, set up a specific contract, but that the recovery, if any can be had in this case, could be had under the common counts for any service that he might have rendered to the defendant in this suit, whether it was agreed to be $50,000, or whether his services were at any less sum."

We think that the letters were not admissible upon this ground; nor, except as far as they related to the transactions leading up to the negotiations with Corning, were they admissible as part of the *res gestæ*. It is immaterial what plaintiff may have done with other parties. The question in this case, as he stated it and framed his issue, was whether he had made an arrangement with Corning, or had opened up negotiations which were left open for defendant to take up and continue, which resulted in a sale or organization of this corporation upon the terms which the parties had agreed upon; and involved in this is the question of what terms it was agreed that such contract should have as a prerequisite to the plaintiff's entitling himself to commissions.

The judgment will be reversed, and a new trial ordered.

The other Justices concurred.