# CHARLESTON

## CHAMBERS v. SIMMONS.

Submitted March 24, 1915. Decided April 13, 1915.

1. MINES AND MINERALS—*Contract Right to Sell or Buy Oil Property—Time Limit.*

   A contract between the owner and another authorizing the latter to sell on commission, or to buy certain oil property at a stipulated price until a well then drilling should be ''drilled in'' and ''completed'', and which provision was manifestly intended to protect the owner from depreciation in the event of a ''dry hole'', or loss from appreciation in the value of his property if such drilling well should come in a good well, is limited to the time between the date of the contract and the time immediately before the drilling in and completion of such well into and through all the oil or gas bearing sands in the vicinity of the well, as contemplated by the parties. (p. 178).

2. SAME—*Oil Well—Agency or Option Contract—''Drilled in''—''Completed.''*

   The words ''drilled in'' and ''completed'', as applied to such oil well then being drilled, and referred to in such agency or option contract, are used synonymously and mean one and the same thing, namely, drilled in and completed through such oil or gas bearing sands. (p. 179).

3. SAME—*Oil Property—Agency or Option Contract—Construction.*

   The time limit of such a contract cannot be controlled by the contract between the owner of such well and the drilling contractors, not referred to therein, nor made with reference thereto, as to what was meant by the words ''drilled in'', or ''completed'', employed in such agency or option contract. (p. 180).

4. BROKERS—*Commission—Sale of Oil Property—Sufficiency of Evidence.*

   In this case the evidence does not support the allegation of the declaration that plaintiff sold or procured purchasers for the property within the time and upon the terms specified in his contract of agency, and entitling him to the compensation provided for therein. (p. 180).

5. SAME—*Commission—Performance—Time Limit.*

   Where as in this case the agency contract to sell real estate is limited to a certain time, or to a certain event, the contract must be performed within the time specified, unless waived, or the contract extended by the owner, to entitle the agent to the compensation stipulated, or to any compensation. (p. 183).

6. SAME—*Commission—Performance Within Time Limit—Sufficiency of Evidence.*

   In this case the facts proven do not show waiver of the time or extension of the contract of agency, or interference by the owner of the property, the subject of the agency.  (p. 183).

7. SAME—*Commission—Performance—Time Limit.*

   Nor do the pleadings and proofs in this case make out a case falling within the rules of *Reynolds* v. *Tompkins,* 23 W. Va. 229, and *Ice* v. *Maxwell,* 61 W. Va. 9.  (p. 185).

   (LYNCH, JUDGE, absent.)

Error to Circuit Court, Wood County.

Action by Okey J. Chambers against H. J. Simmons.  Judgment for defendant, and plaintiff brings error.

*Affirmed.*

*V. B. Archer, L. N. Tavenner* and *Thos. P. Ryan,* for plaintiff in error.

*Pendleton, Mathews & Bell* and *Van Winkle & Ambler* and *W. H. Wolfe,* for defendant in error.

MILLER, JUDGE:

In assumpsit the declaration contains a special count, and certain common counts for labor performed, money had and received, money due on account stated, and damages for breaches of defendant's agreement pleaded in the special count.

The bill of particulars, demanded by defendant, consists of two items, the first, to 10% of $125,000.00, commissions on sale of royalty oil and gas interests in lands situated in Roane County, West Virginia, $12,500.00; second, to difference between the price at which defendant sold said interests to H. C. Woodyard and others and the price at which plaintiff could and would have sold and was entitled to sell the same under his contract with defendant, $30,000.00, total $42,-500.00.

The two contracts pleaded as one in the special count are each dated January 23, 1913.  The first is designated by plaintiff's counsel as the agency contract; the second, as the option contract.  By the first, defendant agreed with plaintiff,

that in consideration of one dollar acknowledged as paid, "and the further consideration of the said Chambers *selling or trying to sell* certain Oil and Gas interests  \*  \*  \*  \* as set out and listed" in schedules attached thereto, and made a part of the contract, "for the sum of One Hundred and Twenty Five Thousand Dollars  \*  \*  \*  \*   at least Twenty Five Thousand Dollars of which is to be paid in cash, should a sale be made and the remainder to be agreed upon with the consent of the said H. J. Simmons, the *said O. J. Chambers is to have until the completion of the Cross Well No. 1 to sell said holdings as above set out.*" By the second contract, and for the like consideration of one dollar, acknowledged as paid, "and the further consideration of the said" plaintiff "*selling or helping to sell the royalties and oil and gas rights*" aforesaid "*the said Chambers is to have an option* on all said properties hereto attached *for the period of time until the Cross Well No. 1, now drilling is drilled in and completed,*  \*  \*  \*  \*   at the price of One Hundred and Twenty-Five Thousand Dollars, and in case a sale is made the said Chambers is *to have 10% for making said sale for his services, and all over the above amount.*"

The words italicized are especially emphasized by counsel in their briefs and oral arguments, as characterizing and controlling the construction of the contracts. The first, or agency contract, provides for no compensation to Chambers; but the second contract, which in terms purports an option to plaintiff to buy the property within the stipulated period, contains, as we see, the provision that "in case a sale is made the said Chambers is to have 10% for making said sale for his services, and all over the above amount."

As noted, the declaration pleads these contracts as one, and as together constituting the whole contract between the parties. Nothing is pleaded or claimed by way of damages for breach of the option contract to buy. Both are pleaded as one for damages for alleged breaches of defendant to pay plaintiff the commissions provided and stipulated in the second contract, for "selling or helping to sell", or "*selling* or *trying to sell*" stipulated in the first, and within the time stipulated in both contracts, namely, on or before the completion of said Cross Well No. 1.

So averring the contract, and as showing performance by him, and his right to recover according to the terms thereof, plaintiff in his said special count further avers, that after much labor and expense and careful attention to details, etc., he ''did secure purchasers for said property  *   *   *   * who were amply able financially to purchase and pay for said property  *   *   *   * within the period of time  *   * *   * provided in said agreement, to-wit,  *   *   *   * before said Cross Well No. 1, then drilling as aforesaid, was drilled in, to-wit, completed'', and that ''said purchasers were ready and willing to accept and take a conveyance of the said property  *   *   *   * and pay the purchase price therefor, *   *   *   * and would have purchased'' the same ''within the time specified and provided in said agreement  *   * *   * before the said defendant wrongfully sold'' the same.

And by way of assigning breaches of the contract by defendant, it is further averred ''that  *   *   *   * defendant did not or would not perform the said agreement  *   *   *   * but craftily and subtly deceived  *   *   *   * plaintiff'', and ''within the time mentioned  *   *   *   * to-wit, between January 23, 1913, and when said Cross Well No. 1 was drilled in, to-wit, completed'', and ''before'' the same ''was drilled in and completed, in violation of his said agreement, and without the knowledge or consent of plaintiff, proceeded himself to make sale of the said'' property ''to the same parties that the plaintiff had induced to become purchasers'' thereof, at the price stipulated in said contract, ''and did not nor would not permit or suffer the said plaintiff to proceed to complete a sale of said property'', and whereby plaintiff was then and thereby prevented from further performance of the contract on his part, and whereby he ''has lost and been deprived of the profits and the percentage for making said sale and for his services in and about the performance of his part of the said agreement, to-wit, for helping to sell,  *   * *   * for trying to sell,  *   *   *   * for selling the said property.''

On the trial, on the issues joined on the plea of non-assumpsit, the verdict of the jury was for defendant, and from the judgment of nil capiat thereon, plaintiff obtained the present writ of error.

The questions presented for decision by the pleadings and proofs, and by the numerous assignments of error, involving instructions to the jury, given and refused, and the motion of the plaintiff for a new trial, overruled, and the judgment of nil capiat against him, are: (1) When was Cross Well No. 1, drilled in and completed, within the meaning and intendment of the parties to the contract? (2) Did plaintiff in fact, as alleged, sell or procure purchasers for the property stipulated in his contract, by contract binding them to buy upon the terms and within the period stipulated in his contract? (3) Did defendant in any way, as alleged, interfere with plaintiff in completing a sale of said property, within the time stipulated, and thereby prevent him from closing up said sale and earning the commission or compensation stipulated in the contract? (4) Did defendant, either within the time stipulated, or afterwards, waive the time, or extend the agreement, and thereby, or by accepting the previous services of plaintiff in trying to sell, or in discovering and proposing prospective purchasers of the property, to whom defendant afterwards made sale thereof, upon the same or different terms, render himself legally liable to plaintiff for the compensation stipulated, or for any compensation for his services?

On the first question, it is fully proven, and not controverted, that Cross Well No. 1, which the contracts pleaded state was then drilling, was drilled into and completed through all the oil and gas bearing sands known to exist in the neighborhood of that well, on or before January 30, 1913. The witness Nuhfer, contractor who drilled the well, says, "We have it recorded, completed January 30, 1913, but it was completed the night before * * * * along close to midnight." And numerous other witnesses, interested in the well, and in other territory in the vicinity thereof, also present, swear to the same fact. And it is a conceded fact that all the sands penetrated were barren of oil or gas, or in the vernacular of the oil fraternity, that the well was a "dry hole." The contract does not in terms define when the Cross Well should be regarded as drilled in or completed. But we know from its provisions and from its manifest purposes and objects that this provision was intended to protect the owner against depreciation due to the possibility of a dry hole, or

loss in the event the well should turn out to be a good well and to greatly enhance the value of the property over the price stipulated in the contract. The parties could have had no other purpose in putting this provision into the contract. Moreover, what they both said and did before and after the making of the contract, and in the effort to sell the property, shows clearly that such was the purpose of the provisions as to time.

Plaintiff went the next day to Charleston, where he saw McDermott, Elkins and Woodyard, the purchasers, and others, and began his negotiations with them. He admits he represented to them that the Cross Well No. 1 was drilling, and that it was necessary for him to close or make sale before that well came in, for if it came in a good well, the price would be more, and if dry the price would be depreciated. He admits that at the time of the contract defendant told him he had offered the property through C. W. Swisher and H. C. Woodyard, both of whom were then in Charleston, and that he was told to see them, and that he wanted him, the plaintiff, "to go and sell this property before Cross No. 1 well was drilled into the berea grit sand." Chambers admits he told McDermott, and McDermott swears that Chambers told him, that he must make the sale before the Cross Well was drilled in, and McDermott swears that Chambers wanted him to agree to take the property and make deposit of the cash payment before that time. Wherefore, conceding ambiguity in the contract on this question, the parties are concluded by their acts and conduct as to what was meant by a completed well. Smith v. South Penn Oil Co., 59 W. Va. 205; Hays v. Forest Oil Co., 213 Pa. St. 556; Glasgow v. Chartiers Co., 152 Pa. St. 48; Archer on Oil and Gas, p. 320.

But counsel for plaintiff reply that one of the contracts says "completed", and that the other uses the words, "drilled in and completed", and that in construing contracts every word must be given some meaning; that a distinction should be made between "drilled in" and "completed", and we are referred to the definitions of these words by lexicographers. When we look to the manifest purpose of these provisions, as disclosed not only by the contracts themselves, but from the acts, conduct and language of the parties, in an effort to

execute the contract, we can get little light from the technical definitions of the words employed. "Completed" may mean "drilled in" and "drilled in" may mean "completed", and it is manifest from the record that they were used synonymously by the parties to this contract, and what the parties meant by them is made clear by the purposes of these provisions. It would be difficult to determine how a well, a "dry hole", drilled through all the sands, could be otherwise completed after it had been drilled into and through all sands, and found to be a "dry hole."

It is furthermore contended that the contract involved here must be construed with reference to the contract between the Fisher Oil Company, owners of Cross Well No. 1, and Nuhfer Brothers, the drilling contractors, and which contains certain provisions for plugging the well, pulling the casing, in certain contingencies, in fulfillment thereof, or the completion of the well within the meaning of that contract. But upon what principle can we say that that contract controls in any way the contract for the selling of the property involved here? The former is not even referred to in the latter. The parties here were not parties to that contract, so far, at least, as the record shows; nor is it shown that they or either of them had any knowledge of its contents. The fact is in evidence that Nuhfer Brothers did not pull the casing until after this suit was brought. Parties to one contract cannot thus be affected by the contracts or dealing between others, characterized as *res inter alios acta*. *Eastburn* v. *Norfolk etc. R. Co.*, 34 W. Va. 681; *Repass* v. *Richmond*, 99 Va. 508, 39 S. E. 160. Other cases cited in 5 Ency. Dig. Va. & W. Va. Repts. 302.

For the foregoing reasons we see no error in defendant's instruction "M", given; saying that if the jury "believe * * * * that the Cross Well No. 1 on the 30th day of January, 1913, had been drilled through, and below all of the sands in which oil or gas is found in the same oil and gas fields or territory, in or near which the said Cross Well No. 1 was and is located, then the said well was a completed well, as contemplated by the terms of the contracts described in the plaintiff's declaration."

On the second question, did plaintiff sell or procure purchasers for the property, as alleged? While the declaration

alleges performance of the contract by plaintiff, and that he did so within the' time stipulated in the contract, the exact date when it is claimed the sale was so made or purchasers procured, is not alleged. While the pleading is sufficient to admit the evidence, that such sale was made and purchasers procured within the time specified, it was necessary for plaintiff to prove, according to our views expressed on the first question, that this was done on or before January 30, 1913, the date of the actual drilling in and completion of Cross Well No. 1. This fact his own and the evidence of his other witnesses wholly fails to establish; nor is it proven by the evidence of defendant's witnesses. Indeed plaintiff does not pretend to have made any such sale or procured purchasers for the property on or before January 30, 1913. The purchasers named by him are Senator Joseph McDermott, Senator Davis Elkins, and Col. Richard Elkins. He puts these parties all upon the stand as witnesses in his endeavor to support his case. He is shown to have had his principal negotiations with McDermott, to whom he was referred, as a representative of the others. These witnesses all deny in positive terms, that they or either of them ever made any contract with plaintiff, or with anybody else, to purchase the property offered by plaintiff on or before January 30, 1913. The whole of plaintiff's contention is that at Charleston, in McDermott's room at the hotel, he "was trying to force a purchase of this property before they reached the Berea Grit sand in the Cross No. 1," and with his maps spread out on the floor, and exhibiting them to these prospective purchasers, he said to them: "I would like to close this deal and if you pay Twenty Five Thousand Dollars down on this, why it can stand over until you can check up the property." To which he admits Senator McDermott replied that "they wouldn't do that." And he further swears that he afterwards saw McDermott, possibly the next day, and that McDermott told him to go back to Spencer, where both parties resided, and see Simmons, and see what was the least price he would take for the property, and that they would buy it from him. Just what day this conversation took place does not appear, but it was before plaintiff left Charleston on January 30, 1913, and defendant claims it was after he had notified plain-

tiff by phone on January 29, 1913, that the well had come in or was coming in dry, or with a little gas. Plaintiff further swears, that on his way back to Spencer on January 30th, he met defendant at Ravenswood, who was then on his way to Charleston, where he told him, not that he had made a sale, but that he had or thought he had the matter in shape to close up with those people, and that he tried to get Simmons not to go to Charleston, but to go back with him to Spencer, and told him exactly how he expected to close the deal at $125,-000.00. But he admits that on the same occasion defendant asked him what he thought he ought to let them have the property for, and that he replied, about eighty five thousand dollars, and that Simmons replied, that he didn't see why he should take less than ninety thousand dollars, and that plaintiff answered that if he "did that it was up to him to do as he pleased about it."

These admissions were far short of indicating to Simmons a sale of his property in accordance with plaintiff's contract. That plaintiff had not at that time made a sale is positively proven by plaintiff's witnesses, McDermott, Elkins and others. Asked on cross-examination: "How far did you get with your negotiations with Mr. Chambers?" McDermott answered: "Why finally in the end I told him it was too large a property to buy off hand, and I wouldn't think of buying it without investigating it, and his option didn't give sufficient time to make a proper investigation, and advised him to return home and get additional time on his option, and secure a better price, as I thought the property was too high priced; he said he would try and do that, and that was the last time I saw him; he said he would try and do that." And the fact is that McDermott never did buy, or become interested in the property.

We cannot detail all the evidence on this question. We give only sufficient of it to show the real situation in which plaintiff's negotiations stood when he left Charleston. And it is an admitted fact that after parting with defendant at Ravenswood on January 30, he never resumed his negotiations, except he says that on Simmons's return from Charleston, he tried to get him to go back with him and close up the deal, but that Simmons declined, saying he was looking for some

one from Pittsburg, and wanted the map loaned plaintiff to show him, and which plaintiff gave him.

Though the rule may be otherwise where no time limit is fixed, and the contract is general and not special, the law is well settled in this State, as elsewhere, that where the agency or brokerage contract to sell land is limited in time, the agent or broker must perform the contract, if unhindered by the owner, within the time stipulated in the contract, or else forfeit all right to compensation, and that no recovery can be had on the quantum meruit, for the value of services performed. *Ice* v. *Maxwell,* 61 W. Va. 9; Clark & Skyles on Agency, section 778, p. 1679; *Alexander* v. *Sherwood Company,* 72 W. Va. 195, 199; *Sibbald* v. *Bethlehem Iron Co.,* 83 N. Y. 384; *Parker* v. *Building & Loan Association,* 55 W. Va. 134; *Hugill* v. *Weekley,* 64 W. Va. 210, 211, 213. On this record then, how can it be contended, on principle, that plaintiff is entitled to damages, on the theory of a literal performance of the contract on his part? It seems to us that the evidence furnishes not the slightest basis on which he can make a stand on this theory of his case.

The third, and next question is, did defendant in any way interfere with the plaintiff in the performance of his contract, excusing strict fulfillment thereof by him, and entitling him to the compensation stipulated, or to any compensation. There is no pretense of any such interference by defendant between the date of the contract and the date of the drilling in and completion of the Cross Well, January 30, 1913. Between those dates plaintiff was at Charleston, and had full sway in attempting to negotiate a sale. He failed. His authority was limited to those dates. On the drilling in of the Cross Well his authority ceased. After that he had no authority to sell, or other authority in the premises. His contract was dead, unless renewed, or continued by act of defendant. In such cases the authorities cited would deny plaintiff compensation.

On the fourth and last question or proposition, neither pleadings nor proofs present a case of waiver of time, or extension of the contract pleaded, unless in point of pleadings such a case is covered by the common counts, and the bill of particulars filed therewith. The first item of the bill of

particulars is, for commission for making the sale, not proven; the second, for the difference between the price at which defendant sold, and that at which plaintiff could have sold the property, as to which there is not the slightest proof. The rule of our decisions is that where all that the plaintiff contracted to do, under a special contract, has been done, and nothing remains to be done, except for the other party to pay the price stipulated, the same may be recovered under the common counts, and special pleading is unnecessary. *B. & O. R. R. Co.* v. *Lafferty,* 2 W. Va. 104; *Lord & McCracken* v. *Henderson,* 65 W. Va. 321.

Assuming such a case to be covered by the pleadings, has it been made out by proof? The record is barren of any proof of an extension of the contract. McDermott advised a new contract, but it was not procured, although it was suggested by plaintiff in his interview with defendant at Ravenswood. But there is not a syllable of evidence that a new or extended contract was made, or time waived. At the time of the Ravenswood interview the contract had already expired. And that defendant did not intend to make a new contract, or waive the terms of the old, is manifest from the fact that he shortly afterwards gave an option contract to Woodyard and others, covering additional property, for fifteen days from February 1, 1913, which also expired by limitation; and thereafter and between that date and the date of sale to Woodyard and Davis and Richard Elkins, plaintiff offered the property to others.

But what of the other theory, that plaintiff discovered the purchasers who were accepted by defendant and to whom he is alleged to have sold the property on the same or different terms? Plaintiff presented this theory by instructions proposed, but which we think were properly rejected by the trial court. That plaintiff did offer the property, covered by the schedules attached to his contract, to some of the parties to whom defendant afterwards sold is conceded; and that his services may have been of some value to defendant may also be conceded. But under a contract to sell, limited in time, he cannot claim the benefit of an unfulfilled contract. The stipulation for trying to sell and helping to sell clearly were limited to a sale that should be made during the life of plain-

tiff's contract.  He could not claim compensation for trying to sell or helping to sell when the sale made did not take place within the life of his contract.

Moreover, the property sold by defendant in March, 1913, included other property than that covered by plaintiff's contract, and the terms and the persons were not the same in all respects.  The sale made was to Woodyard, Davis and Richard Elkins, and was of a four fifths interest, defendant retaining a one fifth, and while the price was the same, the property sold embraced much more than that scheduled in plaintiff's contract; it included additional producing wells, and defendant became bound by his contract to complete at his own expense other wells then drilling; so we think plaintiff has failed to make a case falling under the rules of *Reynolds* v. *Tompkins,* 23 W. Va. 229, and *Ice* v. *Maxwell, supra,* and other decisions cited.

The instructions given being substantially in conformity with these views, and those rejected either opposed or substantially covered by those given, we see no reversible error in the rulings of the court thereon.  It follows, therefore, that there was no error in the judgment complained of, and we are of opinion that it should be affirmed, and it will be so ordered.

*Affirmed.*