ARCH R. SAMPSON, Respondent, v. NELSON Z. GRAVES, Appellant.

First Department, January 27, 1922.

**Principal and agent — commissions — action to recover commission for procuring party to advance money to defendant — plaintiff not entitled to commission though party produced subsequently made advance through another broker — compromise verdict.**

The plaintiff was not entitled to recover commissions for procuring a party to advance money to the defendant for the purpose of relieving the defendant of financial difficulties, where it appeared that the plaintiff entered into negotiations with a party to advance the required amount, but that said party refused to make the advance on the proposition offered by the plaintiff, though he did later, through the efforts of another broker, entertain a different proposition and advance the required amount to the defendant, for the plaintiff was entitled to commissions on his contract with the defendant, only in case he himself should be successful in concluding negotiations for the advance of the money.

A verdict which is not based upon the evidence but shows the result of compromise as to liability cannot stand.

APPEAL by the defendant, Nelson Z. Graves, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 28th day of October, 1920, upon the verdict of a jury, and also from an order entered in said clerk's office on the 1st day of November, 1920, denying defendant's motion for a new trial made upon the minutes.

*Konta, Kirchwey, France & Michael* [*Karl W. Kirchwey* of counsel], for the appellant.

*Scott, Gerard & Bowers* [*Spotswood D. Bowers* of counsel; *Stewart W. Bowers* with him on the brief], for the respondent.

PAGE, J.:

The action is to recover a broker's commission. The defendant, prior to 1915, was the president and owner of substantially all of the capital stock of the N. Z. Graves Company, engaged in the business of manufacturing paints and varnish in the city of Philadelphia, a receiver for which

was appointed in May, 1913. He also owned five-sevenths of the stock of the Cape May Hotel Company, all of the stock and bonds of the Electric Street Railway Company of Cape May, all the stock of the Electric Light and Gas Company of Cape May, all the stock of the Cape May Farmstead, Inc., all of the Cape May Dredging Company, and $1,501,000 par value of stock in the Tecopa Consolidated Mining Company. In the spring of 1915 an arrangement was made by which the property of the N. Z. Graves Paint Company was bought in by the creditors' protective committee, and a corporation was formed, known as the N. Z. Graves Corporation; and another corporation was formed by the said committee, known as the Mutual Liquidating Company, which took over all the other assets of the defendant. The creditors' protective committee operated these two corporations, and all the net profits went to the said committee to be distributed by it to the defendant's various creditors. The liquidating company entered into a contract to sell to one Shields the Cape May properties for $250,000, which were capitalized at $1,695,000. This agreement expired July 31, 1917. The defendant was dissatisfied with the management of the corporation by the creditors' committee and with the agreement to sell the Cape May properties, and in 1916 commenced an action in equity to compel an accounting. This action was pending and not concluded until after September 13, 1917. The defendant was anxious to get his properties out of the hands of the creditors' committee, and had negotiations pending with several persons in New York and Philadelphia to secure a loan, which would enable him to pay off the creditors' committee and to resume control of his affairs. In the latter part of 1916, as the result of a casual conversation on a railroad train with one of defendant's employees, the plaintiff, who was a bond broker and salesman residing in Boston, Mass., became aware of defendant's need of financial assistance, and wrote to him asking for an interview, which subsequently defendant granted. The plaintiff and defendant met on February 2, 1917, in New York city, and defendant informed plaintiff of his needs, and also that negotiations were then pending with New York and Philadelphia parties, and that he must not apply to persons in those cities. Plaintiff said that he had a Connecticut

clientele, and suggested that the money should be raised on seven per cent preferred stock, and defendant approved the plan. Plaintiff testified that the defendant said he would need $500,000 and that he would pay ten per cent. Plaintiff arranged a meeting between defendant and George E. Matthies of Seymour, Conn., at the Biltmore Hotel in New York city on February 13, 1917. On this date the plaintiff claims in his complaint that he procured Matthies as a person of financial responsibility who was ready, able and willing to furnish to the defendant financial assistance of the character specified by the defendant, in the sum of $500,000, and that Matthies was then and there able, ready and willing to furnish such financial assistance to the defendant and such corporations in said sum of $500,000 upon the security of the defendant's equities and securities. The plaintiff testified that at this meeting on February 13, 1917, Matthies definitely agreed to advance to the defendant $600,000. He produced nothing tending to corroborate his testimony. In. fact, in a letter that he wrote defendant on March 13, 1917, a month after this interview, he asked defendant to meet Matthies, saying that Matthies did not· think defendant realized the amount needed, but that he was willing to go to New York just to meet defendant and thresh things out, and continued: " Hoping that you will meet him and get down to a basis you can both agree to do business on." This letter was put in by plaintiff and tended strongly to discredit his testimony that Matthies had made a definite agreement on February thirteenth. Matthies was called as a witness for the defense and denied that he was ready or willing on February thirteenth to advance any money, and denied that he agreed to do so. He testified that he merely listened to the proposition and discussed it, and agreed to look into it; that he thereafter went to Philadelphia and investigated the mills of the defendant and made some investigation of his business affairs, and thereafter informed plaintiff that he would not entertain the proposition. Defendant also testified that he made no definite arrangement with Matthies at any time through the plaintiff's efforts, and Matthies declined to entertain the plaintiff's proposition, and that plaintiff had thereafter stated that he desired to take up the proposition with two Englishmen who were then in

California, but defendant told him that he would not have time to enter into negotiations with them. Plaintiff admitted that, in the latter part of March or the first part of April, he proposed to the defendant to take up the matter with these two Englishmen. After Matthies refused to consider plaintiff's proposition, certain others proposed to Matthies that he join in with them and form a syndicate to finance the defendant's business. This proposition Matthies also declined. In the latter part of May, 1917, Messrs. Wilson & Carr, who had obtained a statement from the creditors' committee, showing exactly what was necessary to take the properties out of the hands of the committee, took the matter up with Mr. Matthies and devised a scheme that met with Matthies' approval, and on August 17, 1917, an agreement was entered into, pursuant to which Matthies advanced $675,000, and the assets were turned over by the creditors' committee. The name of the Mutual Liquidating Company was changed to Greater Cape May, Inc., and the Cape May properties were transferred to this company. N. Z. Graves, Inc., was incorporated and took over the paint and varnish business. All the stock and bonds of these corporations and certain other assets of the defendant were pledged with Matthies as collateral security for the loan. On payment of the loan, forty per cent of the stock of these corporations and ten per cent of the mining stock was to be retained by Matthies, and the remainder of the stock and the other assets were to be returned to the defendant. For their services in this matter Wilson & Carr were paid $25,000 by the defendant.

From this evidence it is apparent that the plaintiff was the first to introduce Matthies to the defendant, and did considerable work in endeavoring to bring the negotiations to a successful issue, but was never able to get Matthies to agree to advance the money. Also it is evident that others were more successful and devised a *modus operandi* that met Matthies' approval, and secured from him the money necessary to effectuate the release of defendant's property from the control of the creditors' committee.

It is well settled " that a broker is never entitled to commissions for unsuccessful efforts. The risk of failure is wholly his. The reward comes only with his success. That

First Department, January, 1922. [Vol. 199

is the plain contract and contemplation of the parties. The broker may devote his time and labor, and expend his money with ever so much of devotion to the interests of his employer, and yet if he fails, if without effecting an agreement or accomplishing a bargain, he abandons the effort, or his authority is fairly and in good faith terminated, he gains no 'right to commissions. * * * He may have introduced to each other parties who otherwise would never have met; he may have created impressions which, under later and more favorable circumstances, naturally lead to and materially assist in the consummation of a sale; he may have planted the very seeds from which others reap the harvest; but all that gives him no claim." (*Sibbald* v. *Bethlehem Iron Co.,* 83 N. Y. 378, 383.)

The plaintiff's letters, his suggestion that he take up negotiations with parties other than Matthies, tended very strongly to demonstrate the inaccuracy of his claim that Matthies and the defendant came to an agreement on February thirteenth, and certainly demonstrated that the agreement of August seventeenth, between the defendant, Matthies, and Wilson & Carr, was not of his procurement.

The manner in which the case was submitted to the jury shows that the jury did not find that the plaintiff had procured either of these contracts. After the defendant's counsel had finished his summation to the jury, over his objection and exception the court allowed the plaintiff to amend his complaint from a cause of action based on an agreement for a definite commission, to one to recover on the *quantum meruit,* and the court charged the jury on that theory. During the discussion of requests to charge, the justice reversed his ruling and attempted to correct his charge, so that the jury were told that if they found for plaintiff it must be for $50,000.

After the jury had retired they asked for further instruction, the foreman stating: " In your charge it is a little confusing in the minds of the jury, and the jury is not sure and want instructions as to whether, if they find that the plaintiff did produce some one ready, able and willing to advance these funds, can they recognize the plaintiff's claim to any proportion or any payment for those services, or must they recognize it without allowing him possibly ten per cent on $500,000, as requested, or must they deny it entirely? " In the course of a lengthy

discussion between court and counsel, the court stated: " I might say that, defendant having stated that he limited his request at that time to $410,000, the jury might find ten per cent of $410,000; " and he charged the jury " that if they find that plaintiff produced a party who was ready, able and willing to furnish a less amount than $500,000, that under the express contract claimed by the plaintiff, and so far as they find it established by the evidence, if the party produced by him was ready, able and willing to furnish a lesser sum, they may find for the plaintiff for ten per cent of that lesser sum that they find that the party was ready, able and willing to pay." The jury next morning returned a sealed verdict for the plaintiff for $41,000. Such a verdict is not based upon the evidence, and shows the result of compromise as to liability and not as to the amount.

The judgment and order should be reversed and a new trial ordered, with costs to the appellant to abide the event.

CLARKE, P. J., LAUGHLIN, DOWLING and MERRELL, JJ., concur.

Judgment and order reversed and new trial ordered, with costs to appellant to abide event.