DOUGLAS REAL ESTATE MANAGEMENT CORP., Respondent, v. MONTGOMERY WARD & CO., INCORPORATED, Appellant.

Third Department, January 24, 1957.

*David L. Dickson* for appellant.,

*John T. De Graff* and *John T. De Graff, Jr.,* for respondent.

GIBSON, J. Defendant appeals from a judgment recovered by plaintiff for real estate brokerage commissions upon a lease to the State of New York of space in a building in the city of Albany.

Defendant was itself the lessee of the entire building under a lease for a term of 15 years, executed in 1947. At that time the State occupied 105,892 square feet of space in the building under leases expiring April 30, 1951, which the owner assigned to defendant, and defendant occupied, and continued to occupy, the remaining 74,209 square feet.

After acquiring its leasehold interest, defendant employed plaintiff as managing agent of the building, under a written management agreement. In addition to management generally, the agreement provided for the services and compensation of plaintiff in negotiating leases of space in the building.

In 1949, approximately two years before its leases were to expire, the State advised defendant that because of the nature of the State unemployment insurance work conducted on the premises and the absence of comparable facilities elsewhere in Albany, notice of approximately 18 months would be required if the State were to vacate the premises. Under authority from defendant, plaintiff thereupon commenced negotiations with representatives of the State for a lease of all the space in the building. When these efforts failed, representatives of plaintiff, defendant and the State attempted to negotiate a new lease of the space then occupied by the State. These negotiations proceeded to a point where defendant drafted and submitted to the State a lease for a five-year term at an increased rental. It is clear that the proposed lease as drawn by defendant was acceptable, except for a clause providing for cancellation on 30 days' notice in the event of default on the part of the State. This clause the State rejected and thereupon, by letter of February 6, 1951, defendant inquired of plaintiff whether the State would accept a forfeiture clause similar to that rejected except for a period somewhat greater than 30 days. In response to this inquiry, a representative of the State advised plaintiff as to the reason for the State's position, by letter written March 6, 1951 at Albany, but by letter of March 5, 1951, written at Chicago, defendant notified the State that possession of the premises would be required on April 30, 1951. A copy of this letter was sent to plaintiff and, on March 22, 1951, following a telephone conversation with plaintiff, the defendant in a telegram to plaintiff reiterated its position. On March 26, 1951, defendant gave notice to plaintiff of the termination of the management agreement as of April 30, 1951.

The State failed to vacate and litigation in various forms ensued and had not been finally determined in January, 1953, some 20 months later, when defendant and the State, dealing directly, commenced negotiations to resolve their controversies and finally, on May 12, 1953, entered into a new lease, retroactive to May 1, 1951. The rent payable under the new lease was very substantially higher than that which plaintiff had tentatively negotiated previously. The lease, however, contained no forfeiture clause such as defendant had previously insisted upon. It is upon the rental payments provided for by the new lease that plaintiff has recovered commissions. The Official Referee found, in substance, that the plaintiff had performed under the agreement by obtaining the State's acceptance of the " material " terms of defendant's proposal and, further, that defendant's insistence on the inclusion of a forfeiture clause in

the lease was "unreasonable", presumably because such a clause would be ineffective in any event to enforce the eviction of the State. It was further found that defendant's demand for possession was "a tactical maneuver" designed to better defendant's position while negotiating a higher rental.

The construction of the management agreement previously alluded to is necessary to determine whether plaintiff's recovery may be sustained.

The agreement provided, in paragraph "Second", that plaintiff would negotiate leases, and renewals of leases, of space in the building, when and on such terms and conditions as defendant might direct or approve, it being further stipulated that no commitment should be made with respect to any lease or modification of any lease, and that no such lease or modification should be binding upon defendant until executed by one or more of its officers.

The agreement in paragraph "Sixth" stipulated the rates of compensation to be paid plaintiff for, among other things, negotiating leases and renewals and provided, further, that if, during the term of the management agreement, negotiations for space in the buildings were begun at defendant's specific written request but the lease not consummated until after the expiration of the agreement, the defendant should nevertheless pay the plaintiff in accordance with the rates thereinbefore specified, "exactly as if this agreement were in force at the time of the consummation of the lease", but that defendant should not be liable for such payment unless the lease or renewal so negotiated should be executed by one or more of defendant's officers.

Paragraph "Seventh" concludes the agreement and relates primarily to its duration, its optional termination by either party and the status of plaintiff following any termination, and includes the provision: "but upon and after any termination of this agreement, Lessee [defendant] shall continue to recognize Manager [plaintiff] as broker in any negotiations *then pending* at the specific written request of the Lessee and shall pay to the Manager, upon the consummation thereof, the compensation provided for herein." (Emphasis supplied.)

It will be seen that there thus exists a variance as between paragraphs "Sixth" and "Seventh" which the factual situation here brings into sharp focus. Paragraph "Seventh" allows brokerage commissions in the event of the consummation, after termination of the agreement, of negotiations "then pending". No such limitation appears in paragraph "Sixth" which provides, in substance, for payment of commissions if negotiations are begun during the term of the agreement and con-

summated thereafter. In our view of the facts, authorized negotiations were begun during the term of the agreement, were discontinued before the term had ended and a lease, claimed by plaintiff to evidence the consummation of the earlier negotiations, was executed after termination of the agreement. If the lease did consummate plaintiff's negotiations with the State, the literal requirements of paragraph " Sixth " were met. If the provisions of paragraph " Seventh " constitute the test, however, plaintiff must fail for we consider that upon the " termination of this agreement " no negotiations were " then pending ", and we are unable to adopt plaintiff's theory that the date of such termination was the date of defendant's notice thereof, at which time some negotiations, whether or not authorized, were in progress. The management agreement provided that it should continue until March 31, 1951 " and, if not then terminated by either party giving to the other thirty (30) days prior notice in writing, shall continue from month to month until terminated by either party at any time by the giving of thirty (30) days prior notice in writing ". Defendant's letter of March 26, 1951 gave notice of termination " as of " April 30, 1951 which thus became the actual termination date and that at which negotiations would have had to be pending, within the provisions of paragraph " Seventh ".

Applying the familiar rule that the writing must be interpreted as a whole (Restatement, Contracts, § 235, subd. [c] ; 3 Williston on Contracts [Rev. ed.], § 618), it seems clear that the requirement of paragraph " Seventh " that negotiations must be pending at the time of the termination of the management agreement, if commissions are to be paid upon a subsequent consummation, must be deemed a requirement additional to the conditions provided in paragraph " Sixth ". Although the latter, standing alone, is complete and self-sustaining as respects compensation, no provision thereof is in direct conflict with that of paragraph " Seventh ", so as to require that one shall yield to the other, and the " then pending " provision of paragraph " Seventh " would be without purpose or effect unless it be deemed additional to those of paragraph " Sixth ". In our view, therefore, the agreement must be construed to provide for payment of brokerage commissions in the situation obtaining here only if negotiations (1) were commenced at defendant's written direction; (2) were pending at the time of the termination of the contract; and (3) were subsequently consummated by lease signed by one or more of defendant's officers. We have found that no authorized negotiations were pending on April 30,

1951, when the contract term ended and it seems clear that, in view of defendant's unequivocal statements in its letter and telegram, none could have been continued to that time by defendant's authority.

Thus plaintiff has failed to show performance within all the time limitations of the contract. We may inquire, however, whether due performance was prevented only by defendant's act in terminating the management agreement and, if so, whether that action was taken "in bad faith, and as a mere device to escape the payment of the broker's commissions", in the language of *Sibbald* v. *Bethlehem Iron Co.* (83 N. Y. 378, 384). (See, also, *Goodman* v. *Marcol, Inc.,* 261 N. Y. 188; *Thoens* v. *Kennedy Realty Corp.,* 279 App. Div. 216, affd. 304 N. Y. 753; Restatement, Agency, §§ 446, 454.)

We find the evidence insufficient to support a recovery on that basis. It is not contradicted that defendant required for its own use space approximating the amount occupied by the State. Upon the State's failure to vacate, defendant continued its occupancy of space in another building, after expiration of its lease, and was obliged to defend eviction proceedings brought by its landlord. At the same time, defendant commenced a County Court proceeding for injunctive relief against the State and instituted in the Supreme Court a proceeding against the State under article 15 of the Real Property Law. The proceeding last referred to was strenuously litigated. (See *Montgomery Ward & Co.* v. *People,* 279 App. Div. 85, affd. 304 N. Y. 646.) Some time later, defendant filed in the Court of Claims a notice of intention to file claim. The implications of this course of conduct on defendant's part, with the accompanying burden, expense and delay of these various legal proceedings, seem clearly to negate the theory that defendant's purpose, alone or in conjunction with a plan to drive a hard bargain with the State, was to deprive plaintiff of commissions.

We thus conclude that defendant's demands for possession were made in good faith and that its efforts to enforce them were without any ulterior motive. The lease finally made was, under the circumstances then existing, consistent with defendant's purpose to obtain possession and may even be deemed to have been in aid of it. After some 20 months of litigation it was apparent that although defendant might obtain an adjudication of its right to possession, that right could not be directly enforced against the sovereign. Thereupon, defendant commenced negotiations which resulted in the lease of May 12, 1953, terminating in less than a year, and thus earlier than the litigation might

otherwise have been concluded. The lease provided a greatly increased rental and, being made retroactive to May 1, 1951, a substantial portion of the consideration was immediately payable, such payment representing rental and other payments for the previous two years, or two thirds of the term. In our view these facts support defendant's contention that the new lease was not the fruition of plaintiff's past negotiations but the means taken to effect a settlement of the controversy, as indeed the lease recited, and perhaps, in practical effect, to offer a greater expectation of the State's yielding possession at a relatively early date than would the further prosecution of the litigation.

The judgment should be reversed, on the law and the facts, and the complaint dismissed.

Foster, P. J. (dissenting). I am of the opinion that the judgment appealed from should be affirmed. Obviously the relationship between respondent and appellant was not one that is ordinarily implied between a principal and a real estate broker. Under the peculiar agreement between the parties here respondent was not obliged to bring negotiations to a successful conclusion. The record is silent as to who drew the agreement, but it is clear from its language that respondent was to be protected as to commissions if: (1) it entered into negotiations for a lease at the instance of the appellant; (2) that negotiations were pending when and if the agreement was terminated; (3) that appellant subsequently entered into a lease with the State. To these contingencies was inseparably wedded the legal principle that appellant was required to act in good faith so far as the respondent was concerned (*Tanenbaum* v. *Boehm,* 202 N. Y. 293; *Goodman* v. *Marcol, Inc.,* 261 N. Y. 188).

Propositions 1 and 3 are undisputed, and the trier of the facts found as to proposition 2 that negotiations were pending at the termination of the management agreement. The evidence in my opinion sustains this finding, and if this finding is accepted respondent is entitled to recover on a contractual basis alone, although bad faith on the part of the appellant is implicit in the appellant's posture that negotiations had terminated.

The term " negotiations " is a rather large and nebulous one, and under the agreement between appellant and respondent it cannot be tied to any specific proposed lease. The fact that appellant had refused a proposed five-year lease, on the trivial ground that it did not contain a forfeiture clause against the State, did not mean *ipso facto* that all negotiations were ended. Nor did the demand for possession of the premises in less than a month, which the appellant must have known it could not get,

necessarily terminate further dealing. It should be noted in this connection that no express instructions to terminate negotiations were conveyed by the appellant to the respondent. The futile litigation instituted by respondent against the State had all the appearance of simply another phase of the large and nebulous term " negotiations " on the part of the appellant.

An inference is strongly suggested that all of these maneuvers were not intended by the appellant, at least in good faith, to terminate negotiations. It was obvious that the State could not be evicted. Moreover the State had advised appellant a long time before that it could not move in less than 18 months. Therefore it must have been reasonably clear that immediate possession would not be yielded and that the State would continue to occupy the premises under some sort of an arrangement. Hence the actions of the appellant, including the discontinuance of heat and other services, seem to have been designed to compel as favorable an arrangement as possible, and to better appellant's bargaining position rather than a sincere desire to obtain possession of the premises. Proof of this rests in the fact that after the futile litigation and the ballyhoo had subsided the appellant made a lease with the State, retroactive to the date the management agreement was terminated, and on terms most advantageous to apellant. Under such circumstances it is unrealistic to say, with respect to respondent's position, that appellant had terminated all negotiations for a lease with the State and was motivated solely by a desire for possession of the premises. The Trial Judge characterized the appellant's acts as " tactical maneuvers ", made in bad faith so far as the respondent was concerned, and correctly so I believe.

The judgment should be affirmed.

BERGAN and HALPERN, JJ., concur with GIBSON, J.; FOSTER, P. J., dissents and votes to affirm, in a memorandum in which COON, J., concurs.

Judgment reversed, on the law and the facts, and complaint dismissed, with costs to the appellant.

Settle order.