158

**COMPANHIA GERAL DE COMERCIO,**
formerly known as Ferris-Buarque,
S. A., Plaintiff,

v.

**AMERICAN AIRLINES, INC., Defendant.**

**No. 63 Civ. 3738.**

United States District Court
S. D. New York.

Feb. 1, 1968.

Richter & Levy, New York City, for plaintiff.

Debevoise, Plimpton, Lyons & Gates, New York City, for defendant.

## OPINION

MOTLEY, District Judge.

Companhia Geral De Comercio, formerly known as Ferris-Buarque, S. A., sued American Airlines for $584,008.57 for commissions allegedly due from American upon the sale of Electra aircraft. Suit was filed in the Supreme Court of the State of New York, New York County. The action was removed, by defendant, to this court pursuant to Title 28, U.S.C. § 1441. After trial of this action in October, 1967, this court enters these findings of fact and con-

clusions of law absolving defendant of any liability to plaintiff.

### Findings of Fact

Plaintiff is a Brazilian corporation. Haroldo Buarque de Macedo is its principal officer. (Both will be referred to as "Buarque").

Pursuant to an April 14, 1960 agreement, Buarque was appointed American Airlines' "exclusive agent for the sale of Aircraft" in Brazil. "Aircraft" was defined to mean Douglas DC–6/6A/6B and Convair CV–240 aircraft *only*. This agreement did not cover the sale of Electras. The agreement could be amended only by a writing.

The REAL consortium ("REAL") was composed of Real S/A-Transportes Aereos; Nacional-Transportes Aereos, S. A.; and Empresa de Transportes Aerovias Brasilia, S. A. REAL was owned principally by Linneu Gomes.

Jorge Carnicero was chief executive of Air Carrier Service Corporation ("Air Carrier"). Carnicero had been part owner, with Gomes, of a Brazilian airline. He sold his interest in this airline to REAL when pressure was put on non-Brazilians to relinquish control of Brazilian airlines. As part of this transaction, Carnicero's corporation, Air Carrier, was made REAL's agent for the purchase of aircraft. (REAL was to buy 85% of its aircraft through Air Carrier). Carnicero, at one time, had been partners with Buarque. Buarque and Carnicero had "fallen out". Buarque would not do business with Carnicero and *vice versa*.

Buarque, by the end of September, 1960, learned that REAL was interested in acquiring Electra-type aircraft. He sent letters, on September 30, 1960, to Braniff Airlines, American Airlines and Paschall International Corporation ("Paschall") inquiring about the availability of surplus Electras. Paschall was a U. S. corporation which had an agreement with American to dispose of American's surplus aircraft. The letters sent by Buarque were all virtually identical.

On the same day, Buarque teletyped a similar request to Mark Aero Supply, Inc. of Miami, Florida. In none of these communications did Buarque reveal that REAL was the prospective purchaser.

Paschall did not reply to Buarque's letter. Braniff and Mark Aero Supply replied in the negative. American sent an affirmative response, on October 6, 1960. It stated:

*CONFIDENTIAL.* We hope that you will be able to work on this Electra problem as quickly as possible and Mr. Cup Grady is planning on being in Rio around the 20th of October to discuss this further with you. Please do not wait for his arrival but start your discussions as soon as possible. American Airlines, at the present time, would not like to have it known that their airplanes are for sale so in your discussions with any Brazilian airlines I think it would be wise to just state that you are offering airplanes from a leading United States Certificated airline operator and, if negotiations get to the serious stage, we will undoubtedly have to reveal who the seller will be.

\* \* \* \* \* \*

The first job is to get the customer to the point of negotiation for the Purchase. When that point arrives, American will assist you personally for the closing.

Congratulations on your activity.

This letter was not intended, by either party, to modify the April 14, 1960, agreement to include Electras as "Aircraft" within the scope of Buarque's *exclusive* agency. Buarque, after receiving this letter, met with REAL's director, Alvarenga to interest him in American's Electras. Alvarenga made no commitment.

Grady arrived in Bazil on October 16, 1960. He met with Buarque. They discussed the possible sale of Electras to REAL, and flew to Sao Paulo to meet with Alvarenga. Buarque, Grady, and Alvarenga discussed the sale of surplus DC–6s and Electras by American to

REAL. Alvarenga made no commitment in regard to the Electras. He rejected the DC–6s. Alvarenga, at the meeting with Grady and Buarque, informed them that Carnicero was REAL's exclusive agent to buy Electras. Grady cabled this information to Paschall.

Buarque and Grady later prepared a written proposal, dated October 18, 1960, of the sale of Electras to REAL. This was sent to Alvarenga. The latter never responded, because REAL "had already made a commitment with Mr. Carnicero to go ahead and buy the airplanes for REAL". Buarque later forwarded additional technical information to Alvarenga. Alvarenga never responded.

Meanwhile, Carnicero was in the United States trying to arrange to buy Electras for REAL. Carnicero began negotiations for Electras before Buarque wrote his letter to American. He had complete authority to negotiate and complete such a deal. Carnicero even had exclusive authority in the United States over REAL's bank account at the Bank of America. At this time, to sell aircraft (especially Electras) to REAL, one had to deal with Carnicero. REAL had delegated to Carnicero complete and exclusive authority to buy these planes for it. Buarque would not deal with Carnicero (and *vice versa*), so Buarque had no chance to sell Electras to REAL.

American was informed of Carnicero's authority. Before American would negotiate about the Electras, it insisted on proof that the party had the authority to negotiate. Carnicero supplied this proof. Carnicero entered a series of complex discussions with American and with the Convair Division of General Dynamics. Carnicero had several discussions with American's Vice-President Hogan, all in relation to the sale of Electras.

Hogan was informed that Paschall (through Grady) was discussing the Electra sale with Buarque. Hogan told Paschall that Buarque was superfluous as Carnicero had exclusive authority to purchase the Electras for REAL.

Paschall sent Grady a telegram on October 24, 1960, telling him to advise Buarque to do nothing further on the Electra deal. On November 1, 1960, Grady cabled Buarque, from Lima, Peru:

PLEASE TAKE NO FURTHER ACTION REAL ELECTRAS TEMPORARILY OFF MARKET. SORRY. GRADY.

After more negotiations and communications, Hogan and Carnicero met on November 17, 1960, in New York, and concluded a deal for a sale of 5 Electras to REAL. American agreed to pay Carnicero's company $70,000 per aircraft, payable as and when the purchase price was paid to American. Carnicero guaranteed redelivery in the United States of the aircraft sold to REAL if REAL failed to pay the purchase price.

On February 15, 1961, American and one of the companies of the REAL consortium entered into formal agreements for the sale of a total of 5 Electras by American to the company, Empresa de Transportes Aerovias Brasilia, S. A., ("Aerovias"). Carnicero signed the agreement for Aerovias.

On the same day, REAL and. Gomes agreed, severally and jointly, to guarantee payment in full for the 5 Electras. Also, on this date, one of Carnicero's companies, Tran-American Aeronautical, Inc. ("Trans-American") and American executed an agreement whereby Trans-American guaranteed redelivery of the Electras in the United States to American if REAL failed to pay. Also, American agreed to pay Air Carrier $70,000 per aircraft on up to 8 Electras sold to REAL, on condition that sale was consummated prior to August 31, 1961. $8,406 was paid, pursuant to this agreement, to Air Carrier.

Payments were made on the Electra contracts to American as follows:

| February 17, 1961 | $ 50,000 |
| February 27, 1961 | $100,000 |
| May 12, 1961 | $171,910.83 |

On March 13, 1961, promissory notes, representing the balance of the purchase price, were executed, by Aerovias,

and delivered to American. A written Aircraft Chattel Mortgage was also executed and delivered to American.

On March 17, 1961, Real S/A-Transportes Aereos; Nacional-Transportes Aereos Brasilia, S.A.; Linneu Gomes and Julia Andrade Gomes, his wife, entered into a written agreement with American by which the agreement of guarantee dated February 15, 1961, was cancelled and superseded, and the parties other than American, and each of them, jointly and severally, guaranteed payment in full in United States dollars of the purchase price plus interest on the unpaid balance thereof and expenses in connection with the agreements, dated February 15, 1961, to purchase Electras.

Aerovias failed to pay the promissory note due August 1, 1961. During August, 1961, Varig purchased all the stock of REAL.

In September, 1961, American notified Aerovias and its guarantors that all of the promissory notes were due and payable. American then sued these parties in New York Supreme Court. Subsequently, the agreements to purchase Electras were terminated. Concurrently, with the termination of these agreements, Varig, which had purchased all of REAL's stock, agreed to buy 3 Electras with an option on 2 more. Eventually, after more negotiations were concluded and under a further agreement, 5 Electras were sold to Varig.

American and Air Carrier, entered into another agreement whereby American agreed to pay Air Carrier a commission on the Electra-type aircraft sold to Varig.

### Conclusions of Law

Plaintiff claims that it is entitled to commission on the sale of Electras to REAL on 4 independent grounds:

1) Plaintiff was entitled to commission on all aircraft sales by American in Brazil, in that he had the exclusive right of sale pursuant to the April 14, 1960, agreement;

2) Plaintiff was entitled to commission on the sale of Electras by American in Brazil, as sole agent of American, pursuant to the April 14, 1960, agreement as amended by the October 6, 1960, letter, to include Electras.

3) Plaintiff "procured" the sale of Electras to REAL.

4) Defendant, in bad faith, terminated Buarque's efforts to sell Electras to REAL.

■ The claim of exclusive right of sale and that of sole agent are both based upon the April 14, 1960, agreement. However this court has found that the April 14, 1960, agreement covered the sale of Douglas DC–6/6A/6B and Convair CV–240 aircraft *only,* and did not cover Electras; and that the October 6, 1960, letter was not an amendment to the April 14, 1960, agreement. Neither Buarque nor American intended or acted as if the October 6, 1960, letter was an amendment. The October 6, 1960, letter from American was in response to Buarque's identical query to 4 airlines; it is clear that Buarque was seeking to determine who would sell Electras and was not seeking an amendment to the April 14, 1960, contract.*

In order for plaintiff to recover, therefore, he must show that he procured the Electra sale to REAL or that American, in bad faith, prevented him from doing so. Sibbald v. Bethlehem Iron Co., 83 N.Y. 378 (1881); Emil v. Hamburg Heaven, Inc., 16 A.D.2d 778, 228 N.Y. S.2d 353 (1st Dept.1962).

### Buarque was not the "procuring cause" of the sale.

Buarque did not procure the sale of Electras to REAL, and, moreover, could not have done so. When Buarque first approached REAL about Electras, they had already decided to buy the planes

---

* As we hold Buarque had no right to commissions on *Electra* sales under the April 14, 1960, agreement, we need not decide whether that agreement created an "exclusive right of sale" as Buarque claims, or an "exclusive agency", as American claims.

and had given Carnicero *exclusive* authority to negotiate and conclude the purchase.

Buarque had several contacts with Alvarenga about the Electras. At the first contact, Alvarenga informed Buarque of Carnicero's agency. Buarque continued to send Alvarenga information about Electras, but Alvarenga never responded. Alvarenga never responded because Carnicero was handling the sale. If Buarque wanted to sell Electras to REAL he should have contacted Carnicero; Buarque knew this. Buarque never did contact Carnicero about the Electras because he would not do business with Carnicero and he knew Carnicero would not do business with him.

█ Under these circumstances, Buarque was not the procuring cause of the sale. Byrne, Bowman & Foushay, Inc. v. 488 Madison Avenue, Inc., 11 Misc.2d 587, 177 N.Y.S.2d 913 (Sup.Ct. N.Y.Cty.1954) aff'd, 286 App.Div. 826, 143 N.Y.S.2d 633 (1st Dept.1955). He must have done more than inform REAL that American had Electras for sale. He must have " * * * interested the parties and been the means of bringing them together * * * " Treadwell v. Truesdell, 207 App.Div. 110, 112, 201 N.Y.S. 624, 627 (3rd Dept.1923). It is clear he did neither. In Sampson v. Ottinger, 93 App.Div. 226, 87 N.Y.S. 796 (1st Dept.1904) plaintiff gave defendant the name of the ultimate purchaser but did not negotiate with that purchaser as the purchaser would not do business with plaintiff. The purchaser then, through its own agent, negotiated directly with defendant seller. Defendant even told plaintiff, "I have got your principal's name and I will protect you." Defendant's independant negotiations with purchaser's agent resulted in a sale. Under these circumstances, closely akin to the case before this court, the Appellate Division of the New York Supreme Court reversed a jury verdict for plaintiff as "clearly against the weight of evidence". This court concludes that, under the circumstances here, Buarque was not the procuring cause of the sale of Electras to REAL.

*American did not, in bad faith, terminate Buarque's efforts to consummate the Electra sale.*

American, upon learning that Carnicero was REAL's exclusive agent to buy Electras and that Buarque was superfluous to such negotiations, told Buarque to discontinue his efforts. This action was in American's own business interest and not to escape payment of commissions. This action was not taken in bad faith.

> * * * if the (principal) acts in good faith; not seeking to escape the payment of commissions, but moved fairly by a view of his own interest; he has the absolute right before a bargain is made while negotiations remain unsuccessful, before commissions are earned, to revoke the broker's authority, and the latter cannot thereafter claim compensation for a sale made by the principal, even though it be to a customer with whom the broker unsuccessfully negotiated, and even though, to some extent, the seller might justly be said to have availed himself of the fruits of the broker's labor. Sibbald, supra, 83 N.Y. at pp. 384–385.

██ In fact, in this case, American did pay some commissions (to Carnicero). Cf. Emil v. Hamburg Heaven, Inc., 16 A.D.2d 778, 228 N.Y.S.2d 353 (1st Dept.1962). It is not "bad faith" for a seller to deal directly with a buyer when the buyer will not deal with seller's agent, Sampson v. Ottinger, supra; and such action by the seller creates no right of commission in the agent. Ibid.

Plaintiff contends that Buarque's efforts could only be terminated after reasonable notice and not at will, citing Hammond v. C. I. T. Financial Corp., 203 F.2d 705 (2d Cir.1953). The *Hammond* case is not in point; the court there expressly found no notice and no termination. Id. at p. 708. In the case before this court, however, notice was given on November 1, 1960. It was not

until more than 2 weeks later that American resumed negotiations with REAL's agent Carnicero.

Unless otherwise agreed, mutual promises by principal and agent to employ and to serve create obligations to employ and to serve which are terminable upon notice by either party; * * *. Restatement (2d) of Agency, § 442 (1958).

■ We hold that American could terminate Buarque's efforts to sell Electras; that they did so upon notice and without bad faith; and that when Carnicero and Hogan discussed the Electra sale on November 16, 1960, Buarque's agency had been rightfully terminated and American was entitled to conclude the sale of Electras to REAL without becoming liable to Buarque for commissions.

Since there is no legal theory which, under the facts of this case, entitles Buarque to a commission, judgment must be entered for defendants.